**Ellis L. SLAUGHTER, Plaintiff,**

v.

**AMERICAN BUILDING MAIN-
TENANCE CO. OF NEW
YORK, Defendant.**

**No. 98 Civ. 3407(RWS).**

United States District Court,
S.D. New York.

Sept. 13, 1999.

---

Levy Davis Maher & Klein, New York City, for plaintiff, by Adam T. Klein, Jonathan A. Bernstein, of counsel.

Greenberg Traurig, New York City, for defendant, by Jamie B. Zalkin, Jerrold F. Goldberg, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Ellis L. Slaughter ("Slaughter") has moved for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting him partial summary judgment against defendant American Building Maintenance Co. of New York ("ABM"), and dismissing ABM's affirmative defense of collateral estoppel. For the reasons set forth below, the motion is granted in part, and denied in part.

### The Parties

Slaughter is a natural person who, at all times relevant to the instant action, resided in Queens, New York.

ABM is a foreign corporation authorized to do business in the State of New York, and at all times relevant to the instant action had a place of business located in Manhattan.

### The Facts

Slaughter was employed by ABM from October of 1995 until August of 1997, when he was terminated due to absences in excess of those allotted to employees under ABM's "no fault" absentee policy. Slaughter was employed as an elevator relief operator and porter, and worked in that capacity for ABM at the World Trade Center in lower Manhattan. Prior to October of 1995, he was employed in a virtually identical capacity by Ogden Allied ("Ogden")—a company whose cleaning responsibilities at the World Trade Center were ultimately assumed by ABM. Slaughter worked the third shift at ABM, which was scheduled from either 10:00 or 10:30 p.m. until early morning.

Slaughter's job responsibilities at the World Trade Center included sweeping, mopping, and removal of trash and debris, as well as the running of elevators when freight elevator operators needed relief.

His duties called for physical labor, including lifting, bending, stooping, and carrying. His immediate supervisor at the World Trade Center was Dee Yacono. From July of 1997 to early September 1997, however, Yacono was temporarily replaced by John Rezaj ("Rezaj").

Under ABM's "no fault" absence policy, employees who take one hundred percent in excess of the sick days allotted to employees under the collective bargaining agreement between ABM and the employees' union are subject to immediate dismissal—though permanent dismissal does not always result should evidence of mitigating circumstances be presented by a terminated employee at a "Step I" grievance hearing. This arrangement permits ABM employees assigned to the World Trade Center a total of twenty absences prior to termination. According to ABM, not all absences due to illness are counted towards an employee's absence quota. Illnesses covered by workers' compensation and state disability laws are excluded, as are "clinic" days under the applicable collective bargaining agreement. More important insofar as the present litigation is concerned, ABM also claims that absences covered by the Family and Medical Leave Act of 1993 (the "FMLA" or the "Act") are not counted under the no fault policy,[1] and that a Department of Labor notice detailing its employees' rights under the FMLA is posted on an ABM bulletin board near its World Trade Center punch clock. ABM's written absence policy does not specifically state that FMLA leave will not

be counted, though other personnel materials submitted by ABM state that ABM will provide its employees with unforeseeable leave under the FMLA if notice is provided "as soon as practicable or within 15 days." (Patton Aff. Ex. U.)

Under company policy employees are obligated to contact ABM at least one hour before the start of their shift if they expect to be absent from work. After 6:00 p.m., ABM's office at the World Trade Center is closed, and employees' absence calls are routed to an answering service.

In March of 1990, while an employee of Ogden, Slaughter injured his back and great toe while he was emptying a garbage dumpster. In the wake of this accident, Slaughter received compensation for approximately eleven months pursuant to a May 20, 1991 decision by the Workers' Compensation Board. In March of 1995, Slaughter suffered another injury at work, which resulted in pain in his left groin, lumbar sprain, and back spasms. On March 31, 1995, Slaughter's physician—G. Peta Carrera, M.D. ("Carrera")—issued a disability certificate indicating that Slaughter would be "totally incapacitated" from March 3, 1995 until April 30, 1995. (Bernstein Aff. Ex. Q.) Between April and October of 1995, Slaughter visited Carrera's office twice weekly for physical therapy. On September 29, 1995, Slaughter's physician certified that he would be able to return to work on October 2, 1995. *Id.* However, the record also contains a note from Carrera stating that Slaughter would

---

1. As Joseph Higgins ("Higgins"), ABM's Human Resources Manager from April of 1997 to February of 1999, states in an affidavit submitted by ABM: "[U]nder this policy, not all absences due to illness are counted towards an employee's permissible amount. For instance, illnesses covered by workers' compensation and/or state disability laws are not counted as absences. Similarly, while the policy itself has not been specifically amended to so state, absences due to an FMLA-qualifying leave are also excluded." (Higgins Aff. ¶ 5.)

According to ABM's Director of Human Resources, Bernard Patton ("Patton"), ABM

complies with or exceeds the FMLA's requirements:

> It is the policy and practice of ABM to grant all eligible employees leave under the FMLA for a qualifying serious health condition. Indeed, since the enactment of the FMLA, ABM has never denied an eligible employee's request for FMLA leave. Rather, ABM routinely grants employees, especially their unionized workforce, even greater leave entitlements than the FMLA provides.

(Patton Aff. ¶ 10.)

be absent, due to a lumbar sprain, from October 16, 1995 until October 28, 1995.

According to Slaughter, pain associated with his back condition recurs periodically, and has resulted in his missing work. In late July of 1997, Slaughter claims that he began to feel pain in his lower back, significant enough such that he was unable to report to work. Slaughter's renewed back discomfort in July of 1997 resulted in his absence from work from July 30 until August 5. He consulted with Dr. Jamil Abraham ("Abraham") for treatment, who provided Slaughter with a note, dated August 1, 1997, stating that Slaughter would be able to return to work on August 5, 1999. (Bernstein Aff. Ex. 3.) The note also indicated, if barely legibly, that Slaughter's absence was back-related. According to Slaughter, this note was provided to Dee Yacono when Slaughter returned to work on August 5th. However, Yacono denies that she was ever provided such a note and, according to ABM, Slaughter never indicated that he had been absent because of a back condition. Slaughter received written warnings on July 30 and 31 for failing to properly report his absence.

On August 19, 1997, Slaughter again experienced back pain. To notify ABM of his anticipated absence, Slaughter called ABM's designated message number. Entries in Slaughter's "absentee calendar," which mark his absences on August 19, August 20, and August 21 as sick days with the code "S," confirm that ABM was, at some point, notified of Slaughter's absences—though the record is unclear concerning whether or not an actual memorialization of Slaughter's message to the answering service would have been kept by ABM in the normal course of affairs. However, in his initial call to ABM Slaughter did not specify that he would be absent due to back troubles. As his own deposition testimony makes

clear, Slaughter did not provide the individual who took his message with any specific explanation why he would not be in work on the 19th, other than that he was "calling in sick." (Bernstein Aff. Ex. E at ¶ 23.) Slaughter was absent from work as well on August 23 and August 24.

On August 20, 1997, Slaughter was examined by Dr. Andre Brutus ("Brutus"). Brutus provided Slaughter with a note stating that Slaughter would be able to return to work on August 22, 1997.[2] The following day, August 21, 1997, Slaughter accompanied a friend, Joe Frison ("Frison"), to the Queens Center Mall (the "Mall"). According to Slaughter, Frison had asked Slaughter to sit in his car so that he would not need to find a parking space at the Mall.

As Slaughter and Frison were returning from the Mall, they happened upon a coworker of Slaughter's—Humberto Herrera ("Herrera"). Herrera, a porter at the World Trade Center, offered to take Slaughter's excuse note from Brutus to work with him that night. Slaughter gave Herrera the note. Herrera, however, neglected to deliver the note to ABM's personnel office. According to Herrera, he realized his oversight when union shop steward Fred Nevis ("Nevis") mentioned that Slaughter had missed a shift. Herrera brought the note the following night, August 22, and gave it to Nevis. According to Slaughter, Slaughter provided Yacono with the note himself when he returned to work on August 25, though Yacono vigorously denies that Slaughter provided her with any doctors' notes for his 1997 absences.

According to Slaughter, his back troubles required him to periodically take off work dating from 1995, and he would tell

---

**2.** The note itself, which appears to have had its date changed from August 20 to August 19, actually states that Slaughter was examined on the 19th. (Bernstein Aff. Ex. O.) While this date would appear to contradict the dates

provided in other papers and documents submitted by Slaughter, resolution of this inconsistency is not necessary to a decision on the instant motion.

his immediate supervisor that his back "hurt so much that [he] couldn't work." (Slaughter Aff. ¶ 19.) Slaughter also indicates that he would provide Yacono with a doctor's note whenever he was absent for more than one day.

However, according to ABM, Slaughter never informed anyone at ABM—either before, during, or after his absences on August 19, 20, or 21—that his absences were due to a back condition. ABM also contends that at no time during Slaughter's employment with ABM was it ever made aware that he had suffered a work-related back injury, while employed by Ogden, that would require him to take time off from work. ABM also contends that, during Slaughter's employment with ABM, he never informed his immediate supervisor—Dee Yacono—that any of his absences were due to back pain, even though he had already received several warnings and suspensions. Nevertheless, absent from the record is any statement or deposition testimony by Slaughter's immediate supervisor in August of 1997—Rezaj—concerning his knowledge of any back troubles Slaughter might have been experiencing.

After his return to work, Slaughter received an "Employee Final Warning" and was fired. According to ABM's "Employee Final Warning" and termination notice—which was signed by ABM supervisors on August 22, 1997, indicates that Slaughter refused to sign on August 25th, and contains Yacono's witnessing signature dated August 25th—Slaughter's absence on August 21 placed him one hundred percent over the absence amount allowed under the applicable collective bargaining agreement. (Yacono Aff. Ex. S.)[3] The basis for the dismissal—that Slaughter

had been absent for twenty-one days—is not in dispute. Prior to his absences in August of 1997, none of Slaughter's absences had been designated as FMLA leave. Between February of 1996 and July 31, 1997, Slaughter had been issued a number of warnings and had been suspended twice. He had been formally warned on April 22, 1997, after eleven absences, about excessive absenteeism, and was suspended for two days on July 31, 1997, but Slaughter's suspensions were not all absence-related—as he was suspended in March 1997 for failing to complete his assigned work routine.

Slaughter filed his complaint on May 13, 1998, alleging violations of the FMLA, Title 8 of the Administrative Code of the City of New York, and Article 6 of New York's Labor Law. Oral argument was heard on the instant motion on April 14, 1999, at which time the motion was deemed fully submitted.

### Discussion

The instant motion seeks summary judgment on Slaughter's FMLA claim, as well as dismissal of ABM's ninth affirmative defense—collateral estoppel.[4]

Summary judgment is appropriate only where the evidence is such that a reasonable jury could not return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56(c), Fed.R.Civ.P., it shall be rendered "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

**3.** Slaughter's actual date of termination appears to be a matter of some dispute, as Slaughter claims that he was not actually terminated until August 27. For the purposes of the instant motion, this is a dispute that need not be addressed.

As an aside, however, it is worth noting that a grievance statement signed by Slaughter on

August 26, 1997 refers explicitly to the termination. (Zalkin Aff. Ex. W.)

**4.** ABM's Amended Answer recites the affirmative defense as follows: "The claims in the Complaint are hereby barred by collateral estoppel." (Amend.Answ.¶ 28.)

judgment as a matter of law." As the Second Circuit has explained:

"As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." However, where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.

*Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (*quoting Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988)) (internal citations omitted). However, just as a defendant's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment, *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991), so too a plaintiff's failure to provide the court with material and uncontroverted evidence affording it judgment as a matter of law merits rejection of its motion for summary judgment.

### I. *Slaughter's FMLA Claim*

Under the FMLA, eligible employees are entitled to take "a total of 12 workweeks of leave during any 12–month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Upon return from leave, the employee is to be restored to his or her former position or to "an equivalent

position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). Employers may not deny or interfere with an employee's rights guaranteed by the FMLA, and are prohibited from discharging or discriminating against any eligible employee who exercises those rights. *See* 29 U.S.C. § 2615(a).

The FMLA directs the Secretary of Labor to issue such regulations as are necessary to carry out its provisions, *see* 29 U.S.C. § 2654, and such regulations have been promulgated at 29 C.F.R. § 825. To state a valid claim under the FMLA, Slaughter must plead facts showing, *inter alia,* that (1) he is an "eligible employee" under the FMLA, as defined in 29 U.S.C. § 2611(2); (2) ABM is an employer under the FMLA, as defined in 29 U.S.C. § 2611(4); (3) he was entitled to leave under the FMLA, as defined in 29 U.S.C. § 2612(a)(1); and (4) he gave adequate notice to ABM of his intention to take leave. *See Santos v. Knitgoods Workers' Union*, No. 99 Civ. 1499(BSJ), 1999 WL 397500, at *3 (S.D.N.Y. June 15, 1999); *Vicioso v. Pisa Bros., Inc.*, No. 98 Civ. 2027(RWS), 1998 WL 355415, at *2 (S.D.N.Y. July 1, 1988).

Defendants do not contest that Slaughter was an "eligible employee" under the FMLA, or that ABM is an employer covered by the Act's terms. Moreover, there appears to be no serious dispute as between the litigants that a significant back or groin injury could occasion leave covered by the FMLA.[5] *Cf. Sarno v. Doug-*

---

5. A "serious health condition," as defined by applicable regulations, can exist when an employee requires inpatient medical care or continuing treatment by a health care provider—which itself may take a variety of forms. *See* 29 C.F.R. §§ 825.114, .800. The final regulations interpreting the FMLA also indicate that chronic, serious health conditions may involve "recurring episodes of a single underlying condition" or "cause episodic rather than a continuing period of incapacity." 29 C.F.R. § 825.114(a)(2)(iii)(B)–(C). Absences attributable to incapacity under Section

825.114(a)(2)(iii) may "qualify for FMLA leave even though the employee ... does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three days." 29 C.F.R. § 825.114(e).

In his affidavit, Slaughter states that his job required heavy lifting and other strenuous activities. While ABM has questioned its notice of Slaughter's asserted back condition, it does not seriously question that a significant back injury subject to intermittent flare-ups

*las Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 157–158, 160–162 (2d Cir. 1999) (discussing FMLA claim of employee suffering from hernia injury and sprained rectus muscle); *Kaylor v. Fannin Reg'l Hosp.*, 946 F.Supp. 988, 997–98 (N.D.Ga. 1996) (degenerative back condition a serious health condition under FMLA); *McGinnis v. Wonder Chem. Co.*, No. CIV.A. 95–4384, 1995 WL 756590, at *3 (E.D.Pa. Dec.21, 1995) ("Both parties agree that Mr. McGinnis' increasingly serious back injury constitutes circumstances leading to unforeseeable leave under the [FMLA]."). *But cf. Beal v. Rubbermaid Commercial Prods., Inc.*, 972 F.Supp. 1216, 1226 (S.D.Iowa 1997) (holding that plaintiff's back injury, which allowed her to resume her normal activities with "minimal restrictions," did not result in "requisite incapacity for protection under the FMLA"), *aff'd*, 149 F.3d 1186, 1998 WL 231267 (8th Cir.1998). The parties' submissions indicate profound disagreement, however, concerning the adequacy of Slaughter's notice to ABM of his need for FMLA-covered leave.

Given the record currently before the Court, the notice provided by Slaughter to ABM is insufficient to merit summary judgment in his favor.

Under the FMLA, employees are required to provide, whenever possible, at least thirty days' notice for planned medical treatment, or for leave that is otherwise foreseeable. *See* 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.302(a). Where treatment or a qualifying reason for FMLA leave is unforeseeable, however, the applicable regulations only indicate that an employee must notify his or her employer "as soon as practicable." 29 C.F.R. § 825.303(a).

Under the Department of Labor's regulations interpreting the FMLA, "as soon as practicable" for unforeseeable leave means "as soon as practicable under the facts and circumstances of the particular case," and "[i]t is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." 29 C.F.R. § 825.303(a). Notice may be provided by the employee him or herself, or by a "spokesperson" if the employee is not able to do so, either in person "or by telephone, telegraph, facsimile ... machine or other electronic means." 29 C.F.R. § 825.303(b).

■ It is not necessary for an employee to invoke the statute expressly, or to refer to the statute when communicating his or her need for leave to the employer. *See Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir.1998); *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir.1995). It is notice of the qualifying reason for leave, and not notice of the FMLA basis for that leave, that must be communicated. Indeed, the FMLA places a significant burden on the employer to both make itself aware of the FMLA's dictates and to inform its employees of their rights under the FMLA. *See* 29 U.S.C. § 2619; 29 C.F.R. §§ 825.300(a), .301. Once an employee gives proper notice of his or her need for leave, the onus shifts to the employer to inquire further if it needs further information to ascertain whether the leave is FMLA-qualifying. If the employer wishes, it may ask that a request for leave "be supported by a certification issued by the health care provider of the eligible employee ... as appropriate." 29 U.S.C. § 2613.

■ Sufficient information must be given to the employer, however, to provide reasonable notice that the employee requests time off for a serious health condition. *See Price v. Marathon Cheese Corp.*,

---

could constitute an injury protected under the FMLA.

The applicable regulations recognize explicitly that chronic conditions causing episodic incapacity are covered by the FMLA. *See Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 312 (7th Cir.1998).

119 F.3d 330, 335 n. 17 (5th Cir.1997). "Nothing in the [FMLA] ... places a duty on an employer to affirmatively grant leave without such a request or notice by the employee. Rather, to invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm,* 149 F.3d at 523 (*citing Manuel,* 66 F.3d at 762). While an employee's statements may give rise to a duty on the part of the employer to inquire into the nature of the employee's need for leave, "the employer is not required to be clairvoyant." *Johnson v. Primerica,* No. 94 Civ. 4869, 1996 WL 34148, at \*5 (S.D.N.Y. Jan.30, 1996) (finding employee's written request for leave based on a matter of "significant financial importance" to employee's family to be inadequate notice of need for leave, despite employee's contention that son's asthma condition was generally known).

Indeed, in a significant number of instances courts have granted or upheld summary judgment or judgment as a matter of law in favor of *defendants* where the notice supplied to the employer was patently insufficient to inform the employer of the employee's qualified reason for taking leave. *See Seaman v. CSPH, Inc.,* 179 F.3d 297, 302 (5th Cir.1999); *Bailey v. Amsted Indus., Inc.,* 172 F.3d 1041, 1046 (8th Cir.1999); *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 980–81 (5th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998); *Carter v. Ford Motor Co.,* 121 F.3d 1146, 1148–49 (8th Cir.1997); *Gay v. Gilman Paper Co.,* 125 F.3d 1432, 1436 (11th Cir.1997). *But see Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1039 (M.D.Tenn.1995) (granting plaintiff employee's motion for summary judgment on FMLA claim, and holding that employer's notification upon employee's return to work that plaintiff's daughter was sick constituted sufficient notice). After a bench trial in *Reich v.*

*Midwest Plastic Eng'g, Inc.,* No 1:94–CV–525, 1995 WL 514851 (W.D.Mich. July 26, 1995), a court similarly concluded that an employee failed to provide her employer with sufficient information about her condition—chicken pox—"to make it evident that the requested leave was protected as FMLA-qualifying leave." *Id.* at \*4. The *Reich* court also found that the employee did not provide notice to the employer "as soon as practicable," in part because she was healthy enough to travel to her bank to make a car payment well before she called to inform her employer of her need for post-hospitalization leave. *See id.* ("Surely, if Ms. Van Dosen was able to go to the bank on the afternoon of November 19, she was 'practicably' able to notify Midwest of her condition at least by that date.").

Resolution of the instant action does not demand a determination as to the exact quantum of information an employee must provide concerning his or her need for qualifying leave, as even under the articulation of the FMLA's notice requirement most generous to Slaughter the record does not entitle him to judgment as a matter of law.

As the Court reads the record, the only real absences at issue with regard to Slaughter's FMLA claim are those from July and August of 1997. While Slaughter makes a token effort to claim that a number of earlier absences in 1996 and 1997 were also due to back troubles, he does not provide any information as to which absences were, in fact, back-related. Indeed, during his deposition Slaughter was unable to state which particular absences were connected to his back troubles and which absences were not. Because Slaughter states in his deposition testimony that, during his employment with ABM, he was absent for reasons unrelated to his back,[6] this inability to specify back-related ab-

---

**6.** When asked whether he was ever absent for "any other reason," Slaughter replied: "Oh, sure. If I had a cold or something or fever or something like this. Sometimes diarrhea, dif-

ferent things, but to say per se exactly for each day just what it was, no. I can't do that." (Zalkin Aff.Ex. A.)

sences delimits the focus of this Court's inquiry. Because Slaughter's absences in July and August of 1997 were, like the straw that broke the proverbial camel's back, the factor that put Slaughter over ABM's "no fault" absence limit, it is those absences that are at issue in the instant action.

Slaughter claims that, because he called ABM's automated absence reporting line and his absences were in due course recorded as "sick" days, he provided ABM with sufficient notice of his need for leave—especially given that ABM was on notice of Slaughter's back problems due to injuries suffered while Slaughter was employed by ABM's predecessor. Slaughter also contends that ABM bore the burden of inquiring further if it questioned Slaughter's need for FMLA leave, a position that essentially "puts the cart before the horse" unless ABM was first properly notified by Slaughter. *See Rhoads v. FDIC*, 956 F.Supp. 1239, 1254 n. 16 (D.Md. 1997).

An employer cannot use its own notice policy to circumscribe an employee's rights under the FMLA, though the employer is certainly able to establish policies for the provision of notice in the normal course of affairs.[7] As one court has explained:

> The FMLA does not specify a particular time limit as to when an employee must call in and request FMLA leave, rather the FMLA mandates that such notice be "as soon as practicable." § 825.303.... A company policy that does not allow for such flexibility nor recognize that in FMLA leave situations it may not be possible for an employee to call in one half and hour before a shift begins violates the employee's rights under the Act. Undoubtedly, an employer can es-

tablish its own policies for usual and customary notice for requesting general leave. But, such policies must defer to the FMLA when FMLA leave is appropriate.

*Mora v. Chem-Tronics, Inc.*, 16 F.Supp.2d 1192, 1216–17 (S.D.Cal.1998); *see* 29 C.F.R. § 825.303(a) ("In the case of a medical emergency requiring leave because of an employee's own serious health condition ... written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved."). If an employer's own policies cannot determine the notice required by the FMLA, however, neither can an employee's superficial compliance with generic sick leave policies automatically mandate judgment in favor of the employee on a FMLA claim. Thus, the mere fact that Slaughter called in to an automated absence line and indicated he was sick, even if this was all that was required of him under ABM's no fault sick leave policy, does not provide grounds for judgment as a matter of law in his favor on a claim brought under the FMLA.

Because Slaughter's specific need for leave on the days he was absent was not foreseeable, he was only required under the FMLA to notify ABM as soon as was practicable. He was not obligated to let ABM know of his need for leave in advance, *see Johnson*, 1996 WL 34148, at *5, but he was obligated to inform ABM of his reason for leave as soon as he was reasonably able.

Even assuming that ABM is a "successor in interest" to Ogden as defined by the FMLA, and that any notice of qualifying injuries possessed by Ogden could be imputed to ABM,[8] ABM's general awareness

---

**7.** Under regulations concerning foreseeable leave, an employer may require its employee to "comply with the employer's usual and customary notice and procedural requirements for requesting leave." *See* 29 C.F.R. § 825.302(d). But, "failure to follow such internal employer procedures will not permit an employer to disallow or delay an employ-

ee's taking FMLA leave if the employee gives timely verbal or other notice." *Id.*

**8.** Under the FMLA, "[e]mployers covered by FMLA also include any ... successor in interest of a covered employer." 29 C.F.R. § 825.104(a). Section 825.107 of the regulations explain that:

of Slaughter's back troubles would not relieve Slaughter of the obligation to inform ABM that he was taking leave because of his back. After all, while an employee's notice to his or her employer should be evaluated in light of the employee's prior need for absences and/or the employer's general awareness of the employee's health condition, "[n]othing in the FMLA, or the governing regulations ... suggests that an employer's duty to inquire may be triggered solely by the employer's knowledge of prior medical events." *Johnson,* 1996 WL 34148, at *6; *see Bailey,* 172 F.3d at 1046 ("Bailey argues that the notice requirements were satisfied by the company's knowledge that he had serious medical conditions, was under medical care, and needed to miss work from time to time. An attempt to satisfy the notice requirements by an indication that he might have to be absent at some unforeseen time in the future satisfies neither the requirement of notice of the 'anticipated timing and duration of the leave,' 29 C.F.R. § 825.302(c), nor the requirement of notice 'as soon as practicable if dates ... were initially unknown,' 29 C.F.R. § 825.302(a).").

> When an employer is a "successor in interest," employees' entitlements are the same as if the employment by the predecessor and successor were continuous employment by a single employer. For example, the successor ... must grant leave for eligible employees who had provided appropriate notice to the predecessor, or continue leave begun while employed by the predecessor. ...

29 C.F.R. § 825.107(c).

In order to determine whether an employer constitutes a "successor in interest," the regulations provide specific factors for evaluation in their totality: "(1) Substantial continuity of the same business operations; (2) Use of the same plant; (3) Continuity of the work force; (4) Similarity of jobs and working conditions; (5) Similarity of supervisory personnel; (6) Similarity in machinery, equipment, and production methods; (7) Similarity of products or services; and (8) The ability of the predecessor to provide relief." 29 C.F.R. § 825.107(a)–(b).

■ The undisputed record only indicates that Slaughter informed ABM that he was "sick," and that he would be absent. In and of itself, Slaughter's call to the automated service provided insufficient notice of his need for leave. *Cf. Satterfield,* 135 F.3d at 980–81 (delivery of note that employee was "having a lot of pain in her side," even when coupled with mother's statement to defendant's manager that employee was "sick," found insufficient to convince rational trier of fact that FMLA notice was adequate).

As the record indicates, Slaughter was absent on prior occasions for reasons unrelated to his back troubles that assuredly would not have been qualified for coverage under the FMLA. In this context, it is hard to divine how Slaughter's call to the automated answering service, standing alone, would have indicated to ABM that he was absent due to back pain.

Moreover, the very evidence submitted by Slaughter as proof of ABM's notice reveals that ABM's notice of Slaughter's need for leave is anything but a foregone conclusion. None of the doctors' notes submitted by Slaughter state that Slaughter would require intermittent leave. Indeed, the September 29, 1995 note from

ABM contends that it never inherited any of Ogden's personnel or medical files, that Dee Yacono never had occasion to review Slaughter's personnel or medical records when she was employed by Ogden, and that ABM therefore should not be considered a successor of Ogden insofar as the FMLA is concerned. Even assuming that such representations are correct, this alone would not militate against treating ABM as Ogden's successor in interest. It is uncontroverted that ABM succeeded Ogden as the cleaning contractor at the World Trade Center, and that both the supervisory and the custodial staff remained substantially the same. The record also indicates that both supervisory and custodial responsibilities and working conditions remained substantially similar after ABM assumed responsibility for cleaning the World Trade Center. Based upon a weighing of all the relevant factors, the Court concludes that ABM was a successor employer under the FMLA. *See Rhoads,* 956 F.Supp. at 1254; *Vanderhoof v. Life Extension Inst.,* 988 F.Supp. 507, 513–14 (D.N.J.1997).

Carrera certified that Slaughter would be able to return to work on October 2, and does not limit the tasks that Slaughter could be assigned. It would neither be reasonable nor consistent with the FMLA's notice requirements to impose a burden upon ABM to inquire affirmatively for every absence thereafter whether Slaughter was, in fact, seeking leave because of his back.

Given that Slaughter's phone call to the automated message service was insufficient to place ABM on notice of his need for FMLA leave, the inquiry necessarily shifts to the doctors' notes that Slaughter alleges he provided to ABM. It is worth noting in this regard that the parties are in vigorous disagreement as to whether or not such notes were ever provided to ABM after Slaughter's July and August absences.

Even construing the disputed facts in Slaughter's favor, however, notes explaining his absences were only provided by Slaughter to ABM on August 5 and August 25—each time more than two business days after he first took leave from work. Moreover, even assuming that Herrera's delivery of a note to the union steward—who was not a member of ABM management—could constitute proper notice under the FMLA, the note was allegedly delivered three days after Slaughter stopped reporting to work. Given the Department of Labor's determination that "[i]t is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible," 29 C.F.R. § 825.303(a), such delay is highly problematic. While nothing in the FMLA required Slaughter to provide ABM with a doctor's note to satisfy his initial notice obligations under the Act, nothing in the record indicates that Slaughter's absences were occasioned by such extraordinary circumstances that he could not be reasonably expected to inform his employer, in appropriate detail, within

two days of learning of his need for leave. After all, while Slaughter claims that his back troubles made him unable to work, nothing in the record indicates that he was unable to contact ABM.

Slaughter apparently takes the position that, because ABM's "no fault" leave policy does not explicitly provide that FMLA leave is not counted towards the twenty days allotted to employees under the policy, the policy in place at ABM constitutes a facial violation of the FMLA. Slaughter points out that leave covered by workers' compensation or state disability laws is explicitly exempted from treatment under the no fault policy, and reads the specific inclusion of these types of leave to indicate that FMLA-covered leave is counted by ABM towards the no-fault maximum.

To be sure, FMLA leave cannot be counted against an employee under an employer's "no fault" attendance policy. *See* 29 C.F.R. § 825.220(c); *Stoops,* 141 F.3d at 312. However, ABM's papers press that ABM does not, in fact, count FMLA-covered leave towards employees' no-fault allotment.

There is, of course, some ambiguity in the record concerning ABM's actual policy regarding the counting of FMLA-covered absences. The scattered and selective portions of deposition testimony submitted by the parties appear to indicate an absence of familiarity, on the part of some ABM supervisory personnel, with the standards and procedures governing FMLA leave, though this impression may be the result of parsing incomplete deposition transcripts. The "absentee calendar" forms utilized by ABM also contain no specific code by which FMLA-qualifying leave could be recorded, though the forms contain a list of numerous codes for "clinic," "holiday," "sick," "sick no pay," and other absences or infractions: (Bernstein Aff. Ex. V.) One conclusion that could be drawn from the forms' failure to include a code for FMLA absences is that ABM does not make a point of classifying its employees' leave as FMLA qualifying or

concerning itself with whether or not such leave is covered by the FMLA. Furthermore, if such forms are the only records kept by ABM of its employees' leave, and ABM does not distinguish between normal sick days and FMLA absences, then ABM would at the very least be in violation of the regulations governing an employer's maintenance of records in compliance with the FMLA. *See* 29 C.F.R. § 825.500.[9] Because the record currently before the court only provides a glimpse at ABM's record-keeping through the lens of Slaughter's own absentee calendar, however, definitive conclusions about such matters cannot be reached.

Slaughter is also correct that the inclusion of specific language in ABM's "Rules and Regulations" excluding illnesses covered by workers' compensation and state disability laws from coverage by the "no fault" absence policy could be read to mean that other types of leave—such as leave under the FMLA—would not be graced with a similar exclusion. *Expressio unis est exclusio alterius*, after all, is a time-honored doctrine of interpretation. Nevertheless, nothing in Slaughter's papers establishes that ABM's general practice was to only grant employees the leave allotted under the no fault policy, and nothing in his papers decisively contradicts ABM's contention that it does not count FMLA leave towards employees' allotments under that policy.

In any event, the record before the Court indicates that Slaughter's notice to ABM was insufficient to merit judgment as a matter of law in his favor. Consequently, Slaughter's motion is denied insofar as it seeks summary judgment on his FMLA claim.

9.  The regulations state that covered employers must maintain records of, *inter alia:*
    Dates FMLA leave is taken by FMLA eligible employees (e.g., available from time records. requests for leave, etc., if so designated). Leave must be designated in records as FMLA leave....

## II.  *ABM's "Collateral Estoppel" Defense*

In its Answer, ABM's ninth affirmative defense states that Slaughter's claims in the complaint are barred by collateral estoppel. Though ABM does not provide any information in its Answer or in its papers to elaborate on the theory undergirding this defense, the basis of the defense would appear to be an opinion and award by a contract arbitrator concerning Slaughter's grievances about a warning letter received March 11, 1997, Slaughter's alleged excessive workload, and Slaughter's suspension from March 18, 1997 through March 20, 1997, as well as Slaughter's later grievance concerning his discharge effective August 22, 1997.

The substance of the contract arbitrator's decision was as follows:

While generally denying the excessive workload complaint, sufficient detailed information was not provided by the Employer to refute the excessive workload complaint.

As to the termination, during the first 8 months of the 1997 calendar year, Grievant was absent 21 days. Grievant provided doctor's notes for some of his absences. The authenticity of the absences is not questioned. It is the excessive number of the absences for which Grievant was discharged. Grievant had previously received written warnings concerning his excessive absenteeism but failed to correct his unsatisfactory attendance record. Grievant was justly terminated.

(Bernstein Aff. Ex. U.) The contract arbitrator's award determined that Slaughter had been unjustly suspended in late March of 1997, and that ABM should therefore pay Slaughter three-days' pay at the then-

29 C.F.R. § 825.500(c)(2). While no particular form of record-keeping is required, *see* 29 C.F.R. § 825.500(b), the employer is nevertheless required to distinguish between qualifying leave and other types of absences.

 

prevailing rate, but that his discharge was sustained.

Even a cursory review of the record reveals that the issues resolved in Slaughter's grievance hearing were distinct from those at issue in the instant action. Absent from the arbitrator's decision is any mention, for example, of the FMLA. This is not surprising, as his task was to resolve disputes between Slaughter and ABM arising under a collective bargaining agreement, and not to resolve every other potential claim that Slaughter might have under state or federal law. Under analogous circumstances, a number of courts within this district have explained that arbitral rulings under a collective bargaining agreement should be given no preclusive effect as to federal statutory claims, though they may be admissible as evidence. *See A.H. Lynch v. Pathmark Supermarkets,* 987 F.Supp. 236, 240–42 (S.D.N.Y.1997) (arbitral ruling pursuant to collective bargaining agreement does not preclude religious discrimination claim under Title VII, though arbitrator's findings to be given "the weight they merit"); *Taylor v. New York City Transit Auth.,* No. 96 Civ. 4322(SS), 1997 WL 620843, at **3–5 (S.D.N.Y. Oct.7, 1997) ("TAB" panel ruling on employee grievance under collective bargaining agreement has no collateral estoppel effect on Title VII action).

Consequently, while the arbitrator concluded that Slaughter's termination was justified due to excessive absenteeism, this finding does not mean that Slaughter did not have a claim under the FMLA—which mandates leave policies rather distinct from those promulgated according to the terms of a collective bargaining agreement. After all, an employer can certainly run afoul of the FMLA without also violating such an agreement.

Conversely, the arbitrator's determination that Slaughter provided doctors' notes for certain of his absences and that the "authenticity of the absences is not questioned" is no indication whatsoever that Slaughter ever provided proper notice to ABM under the FMLA, or that the absences at issue necessarily qualified for coverage under the FMLA.

To the extent that ABM's ninth affirmative defense seeks to insulate ABM from FMLA or other liability not premised upon the collective bargaining agreement, the defense is therefore invalid and shall be dismissed as a matter of law.

### Conclusion

For the reasons stated above, Slaughter's motion for summary judgment is therefore granted in part and denied in part. The motion is denied insofar as it seeks an order granting Slaughter summary judgment on his FMLA claim, and granted insofar as it seeks dismissal of ABM's affirmative defense of collateral estoppel.

It is so ordered.