**Jaime PESOK Plaintiff,**

v.

**HEBREW UNION COLLEGE— JEWISH INSTITUTE OF RELIGION Defendant.**

**No. 01 Civ. 4552(RLC).**

United States District Court, S.D. New York.

Dec. 5, 2002.

The Offices of Scott Gale, Brooklyn, NY (Scott Gale, of counsel), for plaintiff.

Schulte Roth & Zabel, L.L.P., New York City (Mark. E. Brosman, Heather Weine, Laurie Malkin, of counsel), for defendant.

## OPINION

### ROBERT L. CARTER, District Judge.

Plaintiff Jaime Pesok commenced this action against Hebrew Union College—Jewish Institute of Religion ("Hebrew Union"), alleging race and religious discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* Defendant now moves for summary judgment on all of plaintiff's claims pursuant to Rule 56, F.R. Civ. P.

## BACKGROUND

Jaime Pesok, a Caucasian Jew, was hired as Maintenance Supervisor for Hebrew Union's New York campus in 1998. (Pesok Aff. ¶ 3; Lutwak Aff. ¶ 5.) In 1999, and again in 2000, Hebrew Union management contemplated restructuring the Maintenance Supervisor position.[1] (Lutwak Aff. ¶ 14; Exh. D.) On June 27, 2000, Alice Lutwak, plaintiff's direct supervisor (a Caucasian Jew), and Rabbi Aaron Panken, Lutwak's superior (also a Caucasian Jew), informed plaintiff that a restructuring would take place. (*Id.* at ¶ 15.)

The Supervisor would be an "exempt" employee, meaning that the position would provide an annual salary rather than an hourly wage, and there would be no overtime pay. (*Id.* at Exh. E.) In addition, the Supervisor would be the first one contacted when fire alarms went off on campus, and the Supervisor would be given 60 days to acquire certain fire and safety licenses. (*Id.*) Finally, the work shift would be 9AM to 5PM according to the initial job description prepared by Hebrew Union. (*Id.*) Pesok's former schedule was 7AM to 3PM. (Pl.'s Stmt. Undisputed [sic] Mat. Facts ¶ 6.)

Although Lutwak had expressed dissatisfaction with Pesok's job performance on at least two occasions prior to the restructuring,[2] Pesok was offered the restructured Maintenance Supervisor position. Over the approximate one week period that followed, plaintiff tried to change some terms of employment. (Lutwak Aff. ¶ 16; Exh. F.) For example, Pesok sought an 8AM to 4PM work shift, as opposed to the 9AM to 5PM shift that Lutwak wanted,[3] he sought more than 60 days to acquire the fire and safety licenses, and sought to delegate the responsibility of being the first contact when there were fire alarms. (*Id.*)

It is clear from the record that, during this period of negotiation, Lutwak was very dissatisfied with Pesok. In an e-mail written to Panken on June 30, 2000, discussing possible accommodations for Pesok, she wrote: "He is not liked by the maintenance staff, he continuously takes short cuts but I did not have a legal reason to fire him. I cannot fire somebody because he is arrogant, defiant [sic] behind my back etc." (Lutwak Aff. Exh. F.)

---

1. Defendant cites several reasons for the restructuring, such as the desire to conform this position on the New York campus with the Maintenance Supervisor post at the other Hebrew Union campuses, to avoid conflicts of interest that arise from having the person who assigns overtime also be a part of the overtime pool, and to lower overtime costs. (Lutwak Aff. ¶ 14; Exh. D.)

2. Lutwak sent two e-mails to Panken, dated May 18, 2000, and June 1, 2000, describing what she believed to be Pesok's mishandling of situations on the job. (Lutwak Aff. Exh. C.)

3. Pesok claims that he was originally told the schedule for this position would be 8AM to 4PM. (Pesok Dep. at 56.)

Nevertheless, Lutwak agreed to a schedule of 8:30AM to 4:30PM and allowed Pesok to reassign the fire alarm duties to a subordinate. (*Id.*) Lutwak notified plaintiff of these changes to his terms of employment by memo on July 5, 2000. (Pesok Dep. Exh. 4.) Despite these changes, defendant contends (and plaintiff does not contest) that plaintiff was still dissatisfied with the position. (Lutwak Aff. ¶ 17.)

Shortly thereafter, on or about July 7, 2000, Lutwak offered the restructured Maintenance Supervisor position to Elio Cruz, who had served as de facto Maintenance Supervisor before plaintiff was hired. (*Id.* at ¶ 18; Exh. H.) Cruz was willing to work a 9AM to 5PM shift, and he already possessed all of the necessary licenses for the post. (*Id.* at Exh. F; Exh. I.) Lutwak drafted a letter to Pesok on July 6, 2000, explaining that Cruz would replace plaintiff as Maintenance Supervisor and plaintiff would become a maintenance staff member. (*Id.* at Exh. J.) She informed Pesok orally of the decision on or about the week of July 10, 2000 and the letter was sent on July 28, 2000. (*Id.* at ¶ 21; Pl.'s Stmt. Undisputed [sic] Mat. Facts Exh. J.)

On or about July 25, 2000, approximately two weeks after receiving oral notice of Hebrew Union's decision to withdraw its offer of the restructured Maintenance Supervisor position, Pesok left work claiming that he had injured his ankle on the job. (Pesok Dep. at 71; Lutwak Aff. ¶ 23.) On July 27, 2000, Pesok submitted a doctor's note, stating that he would be absent from work until July 31, 2000 due to an "ankle strain/sprain." (Lutwak Aff. Exh. L.) On August 3, 2000, Pesok submitted a second doctor's note stating that he would be absent from work for two more weeks (i.e., through August 16) due to the "[a]nkle sprain/strain." (Lutwak Aff. Exh. M.) Rather than taking unpaid medical leave

for two weeks, Pesok decided to use paid vacation days through August 18, 2000. (Pesok Dep. at 88, 91.)

Pesok was scheduled to return to work on Monday, August 21, 2000 but did not report to work or contact defendant. (Lutwak Aff. ¶ 27; Exh. O.) On August 23, 2000, the third day of no contact from plaintiff, Lutwak deemed plaintiff's failure to return to work a resignation, pursuant to Hebrew Union's Personnel Handbook, which states "[t]he following may also be considered resignation: (a) if an employee is absent for 3 consecutive days without notifying his/her supervisor...." (*Id.* at ¶ 29; Exh. A.; Exh. P.)

On August 25, 2000, Lutwak drafted a letter confirming Pesok's resignation and circulated it via e-mail for revision and approval. (*Id.* at Exh. P.) On August 28, 2000, before the letter confirming Pesok's resignation was mailed, Hebrew Union received a faxed doctor's note stating that Pesok would be absent from work until his next doctor's evaluation due to a herniated lumbar disc. (*Id.* at Exh. Q.) Thereafter, Pesok received Lutwak's letter, notifying him that Hebrew Union considered him resigned as of August 21, 2000, his first missed day of work. (*Id.* at Exh. P; Pl.'s Stmt. Undisputed [sic] Mat. Facts ¶ 16.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56, F.R. Civ. P. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against

the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Nevertheless, the moving party will be entitled to judgment as a matter of law where the nonmoving party fails to make a significant showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing summary judgment "may not rest upon mere allegations," rather he must "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), F.R. Civ. P.

## II. Title VII Claims

In bringing a case under Title VII, plaintiff bears the initial burden of making out a prima facie case of discrimination. *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir.2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In order to establish a prima facie case, plaintiff must show: 1) membership in a protected class; 2) that he was qualified for the position; 3) that he suffered an adverse employment action; and 4) a preference for a person not of the protected class. *Id.* at 153–54. Alternatively, the fourth element may be shown either by demonstrating that the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination, or by showing that the position was ultimately filled by an individual who is not a member of the protected class. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir.2001) (citations omitted).

If a plaintiff succeeds in establishing a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Farias*, 259 F.3d at 98. Once the defendant has articulated a legitimate, non-discriminatory reason for the adverse employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.* (citing *James*, 233 F.3d at 154).

## A. Plaintiff's Alleged Demotion

Pesok claims that Lutwak restructured the Maintenance Supervisor position in an effort to give this post to Elio Cruz, a non-Jewish Hispanic, and demote Pesok to a non-supervisory position. (Pl. Mem. Opp. Def.'s Mot. Dismiss [sic] at 5.) Defendant responds that the supervisory position that Pesok occupied was restructured for several legitimate reasons, and when Pesok refused to accept the hours and other terms of the new supervisory position, defendant placed someone else in that post.

Plaintiff alleges discrimination on the bases of religion and race. As a Jew, Pesok is a member of a protected class on the basis of his religion. *See Meiri v. Dacon*, 759 F.2d 989 (2d Cir.1985). As a Caucasian, Pesok is protected from discrimination on the basis of race. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (holding that Title VII prohibits racial discrimination against whites upon the same standards as racial discrimination against non-whites).

Despite the holding of *McDonald*, courts in the Second Circuit have disagreed as to whether white plaintiffs have a heightened burden of proof where reverse

discrimination is alleged, as it is here. *Compare, e.g., Olenick v. New York Tel.*, 881 F.Supp. 113, 114 (S.D.N.Y.1995) (Knapp, J.) (holding that a non-minority plaintiff must allege that "defendant is that 'unusual employer who discriminates against the majority'") *with Cully v. Milliman & Robertson, Inc.*, 20 F.Supp.2d 636, 640–41 (S.D.N.Y.1998) (Motley, J.) (rejecting *Olenick* and holding that based on *McDonald*, which states that Title VII "proscribes racial discrimination . . . against whites on the same terms as racial discrimination against non-whites," a white plaintiff does not have to fulfill a higher prima facie burden). Most of the recent decisions of this court have rejected a heightened burden for white plaintiffs. *See Tappe v. Alliance Capital Mgmt. L.P.*, 177 F.Supp.2d 176, 181–83 (S.D.N.Y.2001) (Scheindlin, J.); *DiLegge v. Gleason*, 131 F.Supp.2d 520, 523 (S.D.N.Y.2001) (Brieant, J.); *Berkowitz v. County of Orange*, 120 F.Supp.2d 386, 397 (S.D.N.Y. 2000) (Conner, J.).

Also informative is the Second Circuit's recent holding in the case of *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). In that case, a white woman established a prima facie case of discrimination based on race and gender by presenting evidence showing that she was white and female, she was qualified, and she was offered a less desirable severance package than a black male employee. *Id.* The Second Circuit did not find it significant that a white plaintiff was bringing a race discrimination suit, nor did it require McGuinness to satisfy a heightened burden of proof to establish a prima facie case of race discrimination. *See id; Tappe*, 177 F.Supp.2d at 182.

Based on the holdings of *McDonald* and *McGuinness*, and the opinions of this court rejecting a heightened burden of proof for white plaintiffs, the court holds that Pe-

sok's burden of proof for his reverse discrimination claim is the same as that for his religious discrimination claim. Pesok satisfies the first element of his prima facie case with respect to each of these claims.

Pesok also establishes the second, third, and fourth elements of a prima facie case. He was apparently qualified for the restructured Maintenance Supervisor position, as evidenced by Hebrew Union offering him the job. He suffered an adverse employment action, in that he was transferred to a non-supervisory position with lower pay and a probationary period. (Pesok Dep. Exh. 6.) Finally, Pesok satisfies the fourth element of his prima facie case because he was replaced by Cruz, who is a non-Jewish, non-white Hispanic, and is therefore not a member of Pesok's relevant protected classes. *See Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 380 (2d Cir.2001) ("the mere fact that a plaintiff was replaced by someone outside the [relevant] protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis.") (citations omitted).

As Pesok has presented a prima facie case, the burden shifts to Hebrew Union to articulate a legitimate, non-discriminatory reason for removing Pesok from the Maintenance Supervisor position. Hebrew Union claims that after restructuring the Maintenance Supervisor position for several legitimate reasons and offering this job to plaintiff, it withdrew its offer because plaintiff would not agree to the terms of employment. (Def.'s Mem. Supp. Summ. J. at 5–6.) Having met its burden of production, Hebrew Union is entitled to summary judgment unless plaintiff can point to evidence that reasonably supports a finding of discrimination. *Farias*, 259 F.3d at 98 (citing *James*, 233 F.3d at 154).

This Pesok fails to do. Though Pesok's memorandum of law asserts that defendant's explanation is a pretext for discrimination, Pesok presents no evidence to support this statement. It is clear from the record that, rather than wanting to remove plaintiff from the supervisor position, Hebrew Union planned all along to place Pesok in the restructured Maintenance Supervisor position,[4] that Lutwak offered the position to Pesok, and even conceded certain terms of employment to try to accommodate Pesok on some issues. Only after making these efforts did Hebrew Union offer the job to Cruz.

Under these circumstances, plaintiff's bald allegations of discrimination are insufficient to survive summary judgment.[5] *See* Rule 56(e), Fed.R.Civ.P.; *Meiri,* 759 F.2d at 998 (2d Cir.1985). Accordingly, defendant's motion for summary judgment is granted with respect to this claim.

### B. *Plaintiff's Alleged Termination*

■ Pesok claims that Hebrew Union terminated him while he was out of work due to an injury, and in doing so, treated him differently from non-white, non-Jewish employees, who were granted medical leave liberally. (Pl.'s Mem. Opp. Mot. Dismiss [sic] at 7.) Hebrew Union claims that it considered Pesok to have abandoned his job after he did not call or report to work for three days after his vacation ended, in accordance with Hebrew Union's written policy.[6]

Pesok has not established a prima facie case of discriminatory termination. Though he is protected under Title VII from discrimination based upon race and religion, as discussed above, Pesok has not shown that he was a qualified employee or that the employment action occurred under circumstances giving rise to an inference of discrimination.

Pesok was unable to work due to his back problem when his employment at Hebrew Union ended, and he has been unable to work ever since. (Pesok Dep. at 95–96.) Thus, plaintiff was not qualified for the position in question and cannot establish the second element of his prima facie case. *See Williams v. R.H. Donnelley, Inc.,* 199 F.Supp.2d 172, 177 (S.D.N.Y.2002) (Conner, J.) (plaintiff who was totally disabled was unable to perform job and therefore

---

4. An e-mail written by Lutwak to Panken before the offer was made to Pesok indicated that Hebrew Union (and Lutwak) planned to place Pesok in the position. In it she wrote: "Arthur is thinking ... about putting Jaim on salary as opposed to hourly..[sic] Cincinnati and L.A. supers are on salary. This makes sense since this way nobody can accuse them of taking the 'best' overtime for themselves ... Inherently there is a conflict of interest if the person who assigns the overtime is also a part of the overtime pool....I would really like to see Jaim get this 'promotion'....In my opinion it is a logical decision and in keeping with standardization among campuses". (*See* Lutwak Aff. Exh D.)

5. Notably, both Lutwak and Panken are Caucasian and Jewish themselves, making an inference of discrimination more difficult. *See Anderson v. Anheuser–Busch, Inc.,* 65

F.Supp.2d 218, 229 (S.D.N.Y.1999) (Sweet, J.); *Toliver v. Cmty. Action Comm'n to Help the Economy, Inc.,* 613 F.Supp. 1070, 1074 (S.D.N.Y.1985) (Sprizzo, J.), *aff'd* 800 F.2d 1128 (2d Cir.1986).

6. Pesok also claims that Hebrew Union's resignation policy discriminated against him as a Jew because it counts Saturday, the Jewish Sabbath, toward the three day grace period. Plaintiff's argument is groundless. Pesok was supposed to return to work on Monday, August 21, 2000, and Lutwak waited until Wednesday, August 23, 2000, before she considered plaintiff to have resigned. Though Lutwak listed the effective date of resignation as August 21, 2000, (the first day of unexcused absence) Lutwak did in fact wait three work days before determining that Pesok had resigned.

failed to satisfy second prong of Title VII prima facie case).

In addition, although Pesok suffered an adverse employment action,[7] he has not shown that Hebrew Union's application of its resignation policy occurred under circumstances giving rise to an inference of discrimination. Though it appears that Lutwak wanted to fire Pesok after Pesok did not accept the terms of the restructured position, the record shows nondiscriminatory reasons for this: Lutwak was dissatisfied with Pesok's performance and thought he was arrogant and defiant.

■ Personal animosity and even unfair treatment are not actionable under Title VII unless discrimination is a motivating factor. *See, e.g., Terry v. United States,* 98 Civ. 8249, 2000 WL 204522, at *12 (S.D.N.Y. Feb.18, 2000) (Buchwald, J.); *Brown v. Time, Inc.,* No. 95 Civ. 10081, 1997 WL 231143, at *12 (S.D.N.Y. May 7, 1997) (Mukasey, J.); *Viruet v. Citizen Advice Bureau,* 01 Civ. 4594, 2002 WL 1880731, at *16 (S.D.N.Y. Aug.15 2002) (Peck, M.J.) (cataloging cases).

Plaintiff has not shown that discrimination was a motivating factor behind Lutwak's decision. Pesok claims that similarly situated employees who were non-white and non-Jewish were treated more favorably, but he has presented absolutely no evidence that Hebrew Union selectively applied its resignation policy to favor non-Jews or non-whites. *See Shumway v. United Parcel Svc., Inc.,* 118 F.3d 60, 64–65 (2d Cir.1997) (plaintiff did not satisfy fourth element of prima facie case because she failed to show that she was treated differently than persons outside the relevant protected class); *Adeniji v. Admin. for Children Svcs.,* 43 F.Supp.2d 407, 425–26 (S.D.N.Y.1999) (Wood, J.), *aff'd,* 201 F.3d 430, 1999 WL 1070027 (2d Cir.1999) (same); *cf. Alfano v. Costello,* 294 F.3d 365, 375 (2d Cir.2002).

Nor has Pesok demonstrated the existence of any discriminatory animus (e.g., through derogatory comments or conduct) of any decisionmakers during his employment at Hebrew Union. *See Reiter v. Metropolitan Transp. Auth. of the State of New York, MTA,* No. 01 Civ. 2762, 2002 WL 31190167 (S.D.N.Y. Sept. 30, 2002) (Koeltl, J.) (plaintiff failed to meet fourth element of prima facie case where plaintiff put forth no factual allegation or evidence of discriminatory animus); *Shabazz v. Montefiore Med. Ctr.,* No. 99 Civ. 4311, 2002 WL 31132886, at *2 (S.D.N.Y Sept. 26, 2002) (Jones, J.) (plaintiff failed to meet fourth element of prima facie case by failing to produce "any direct evidence or statistical evidence or circumstantial evidence that raises an inference of discrimination"); *Kalsi v. New York City Transit Auth.,* 62 F.Supp.2d 745, 754–55 (E.D.N.Y. 1998) (same). In fact, Pesok himself does not believe that Hebrew Union's actions were motivated by his race or religion, but rather by discrimination against him as a "human being."[8] *Cf. Mendoza v. SSC & B*

---

7. Viewing the evidence in the light most favorable to plaintiff, his "resignation" was an adverse employment action. There is no evidence that Pesok intended to resign. Rather, it appears from the record that Lutwak found a reason to terminate plaintiff when he missed three days of work and didn't call her. *Cf. Boyd v. Presbyterian Hosp.,* 160 F.Supp.2d 522, 536 (S.D.N.Y.2001) (Batts, J.) (listing materially adverse employment actions) (citations omitted).

8. Pesok's deposition transcript indicates that plaintiff himself does not believe he was discriminated against on the basis of his being Jewish or Caucasian. The relevant portion of Pesok's deposition transcript (Pesok Dep. at 100–101) reads as follows:

Q: Do you believe that Hebrew Union College discriminated against you?

A: At first when I talked to my attorney and he told me that I laughed because I did not understand. I told him, how is it possible? I

*Lintas, New York,* 913 F.Supp. 295, 301 (S.D.N.Y.1996) (Sweet, J.) (plaintiff did not establish a prima facie case of discrimination in part because he admitted that he was aware of no basis for his discrimination claim).

Plaintiff's mere unsubstantiated assertion of discrimination is inadequate to show circumstances giving rise to an inference of discrimination. *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998) ("a jury cannot infer discrimination from thin air"). As the Second Circuit has stated, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri,* 759 F.2d at 998. Summary judgment is therefore granted with respect to this claim.

### III. Family and Medical Leave Act Claim

█ Pesok claims that he was entitled to FMLA leave because of a back injury that presented itself while he was out of work due to a sprained ankle. He alleges that he was denied this leave despite the fact that he "repeatedly requested medical leave in person and via telephone." (Pl.'s Mem. Opp. Mot. Dismiss [sic] at 11.)

To state a valid claim under the FMLA, Pesok must plead facts showing that 1) he was an eligible employee under the FMLA; 2) Hebrew Union is a covered employer, 3) he was entitled to leave; and 4) he gave adequate notice to Hebrew Union of his intention to take leave. *Slaughter v. Am. Bldg. Maint. Co. of New York,* 64 F.Supp.2d 319, 324 (S.D.N.Y. 1999) (Sweet, J.). Here, plaintiff has not established a prima facie case because he has not met his burden of proof with respect to any element of his FMLA claim.

Pesok lost his job pursuant to Hebrew Union employment policy on August 23, 2000, because he failed to report to work or contact his supervisor for three days after his paid vacation ended. When plaintiff finally gave notice of his back condition on August 28, 2000, he was no longer employed by Hebrew Union. Plaintiff has therefore failed to show that he was an eligible employee entitled to leave, the first and third elements of his prima facie case.[9]

█ In addition, Pesok has not alleged facts to show that Hebrew Union is a covered employer under the FMLA. The statute defines "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working

---

mean, I'm Jewish myself. How can they discriminate against me? But now I started to understand.

Q: What's your understanding of how Hebrew Union college discriminated against you?

A: In simple words, I would have had more rights to talk than I had, and I could see already how they were discriminating against some of the employees versus others.

   Ms. Malkin: I don't think he's answering my question, so let me see if I can get a little bit more specific here.

Q: What's your basis for believing that Hebrew Union College discriminated against you on the basis of your being Jewish specifically?

A: I'm not saying as a Jew, I'm saying as a human being.

Q: So they didn't discriminate against you on the basis of your religion?

A: I hope not. I hope not. . . .

9. Had plaintiff had been unable to contact defendant prior to August 23, 2000, due to his medical condition, the court might reach a different conclusion as to plaintiff's employment status. The court need not address this question because, as discussed below, there is no evidence that plaintiff was unable to contact Hebrew Union prior to that date.

day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4) (2002). While Hebrew Union may be a covered employer, plaintiff has not alleged any facts with regard to this issue, and has therefore failed to meet his burden of proof on this essential element of his claim.

■ Finally, as alluded to above, Pesok has failed to show that he gave adequate notice to Hebrew Union of his intention to take leave. Where a qualifying reason for FMLA leave is unforeseeable, the FMLA requires that an employee notify has or her employer "as soon as practicable." *Slaughter*, 64 F.Supp.2d at 325 (citing 29 C.F.R. § 825.303(a)). The Department of Labor's regulations interpret this language to mean "as soon as practicable under the facts and circumstances of the particular case" and the regulations further explain that "[i]t is expected that an employee will give notice to the employer within no more than one to two working days of learning the need for leave, except in extraordinary circumstances where such notice is not feasible." *Id.* This does not necessarily require Letting an employer know of the need for leave in advance, but simply obligates an employee to inform his or her employer "as soon as [the employee] [i]s reasonably able." *Id.* at 327.

Defendant is not liable for failure to grant Pesok additional leave after his vacation ended because Pesok has not shown that he provided defendant with timely notice of the need for additional leave. Pesok did not notify Hebrew Union that he had a back problem until August 28, 2000, one full work week after he was supposed to return to work. As plaintiff has presented no evidence that he was unable to contact Hebrew Union prior to August 28, 2000, he has failed to demonstrate that his notice was adequate under the circumstances. *See id.* at 329 (notice inadequate where employee gave notice three days after he stopped reporting for work, and nothing in record indicated extraordinary circumstances preventing employee from contacting employer earlier).[10]

Pesok has failed to establish a prima facie case under the FMLA. Accordingly, Hebrew Union is entitled to judgment as a matter of law.

## CONCLUSION

Plaintiff fails to state any claim upon which relief may be granted. Defendant's motion for summary judgment is granted in its entirety and plaintiff's suit is dismissed.

### IT IS SO ORDERED.

---

**10.** Prior to August 28, 2000, the only health problem that defendant was aware of was a sprained/strained ankle, which, according to Pesok's doctor's notes, only required leave until August 16, 2000. The doctor's notes submitted by Pesok did not provide adequate notice of the need for additional leave. *Cf. Slaughter*, 64 F.Supp.2d at 328–29 (employer's notice of need for additional leave was "anything but a foregone conclusion" where previous doctor's notes certified that plaintiff would be able to return to work by [an earlier date], and did not state that plaintiff would require intermittent leave). Further, Hebrew Union did not have a duty to affirmatively inquire as to the reason for Pesok's absence when he failed to return to work, as nothing in the FMLA or the governing regulations suggests that an employer has a duty to inquire as to the reason for leave based solely on the employer's knowledge of prior medical events. *Id.* at 328–29 (quoting *Johnson v. Primerica*, No. 94 Civ. 4869, 1996 WL 34148, at *6 (S.D.N.Y. Jan.30, 1996)).