Wayne TAPPE, Plaintiff,

v.

ALLIANCE CAPITAL MANAGEMENT
L.P., Defendant.

No. 01 CIV.2068(SAS).

United States District Court,
S.D. New York.

Oct. 25, 2001.

Jeffrey L. Liddle, Esq., Liddle & Robinson, L.L.P., New York City, for Plaintiff.

Frances Mary Maloney, Esq., Gerald Spada, Esq., Epstein Becker & Green, P.C., New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On the day that end-of-the-year bonuses were to be paid, Alliance Capital Management ("Alliance") fired Wayne Tappe, a 38–year old white male. A year later, Tappe brought this Complaint alleging six claims of race and sex discrimination in violation of federal, state, and city laws, and one claim of age discrimination in violation of city law. In addition, Tappe brought two state law claims against Alliance for failing to pay him a bonus. Finally, based on the allegation that Alliance did not provide him with compensation under its severance plan, Tappe brought two state claims or, in the alternative, one federal claim.

Alliance now moves to dismiss all of Tappe's discrimination claims, one state claim for failing to pay a bonus, and both state claims for failing to provide severance. For the reasons fully discussed below, although Tappe is a young white male, he is not required to allege any "special circumstances" to support his claims of discrimination. Nonetheless, Tappe has failed to plead his discrimination claims with sufficient particularity to state a claim. While the motion to dismiss Tappe's state claim with regard to his bonus is denied, the motion to dismiss his two state

claims with regard to Alliance's severance plan is granted.

## I. LEGAL STANDARD

When deciding a motion under Federal Rule of Civil Procedure 12(b)(6), courts must "take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of plaintiff." *Weinstein v. Albright*, 261 F.3d 127, 131 (2d Cir.2001). A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000) (quotation marks and citation omitted). Courts should "include in this analysis not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the pleadings or in documents incorporated by reference." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001). Finally, courts must remain "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Id.*

## II. FACTUAL BACKGROUND

The following allegations are relevant: Alliance Capital Management fired Wayne Tappe on December 8, 1999, the day on which it was to pay bonus compensation to its employees. *See* 12/12/00 Complaint, Ex. A to Declaration of Gerald Spada, defendant's counsel, ¶ 13. At the time, Tappe was a 38–year old white male who had worked for Alliance since 1987 as a Senior Portfolio Manager in its High Yield Group. *See id.* ¶ 10. Throughout his employment, Alliance compensated Tappe with a base salary and an annual bonus. *See id.* ¶ 12. For example, in 1997 and 1998, Alliance paid Tappe a base salary of $125,000 and a bonus of $650,000 and $700,000 respectively. *See id.* ¶ 12. In 1999, Alliance increased Tappe's base salary to $150,000. *See id.* ¶¶ 10, 12.[1] After being fired, Tappe did not receive a bonus or severance pay despite Alliance's longstanding policy to grant both. *See id.* ¶¶ 25–26, 78.

When Tappe sought an explanation from Wayne Lyski, the head of Alliance's Fixed Income Division and the person who fired him, he said "that Tappe did not fit with the profile of the High Yield Group and its strategy going forward." *Id.* ¶ 14. The four other portfolio managers who worked with Tappe in the group included: Sheryl Rothman and Vita Pike (two white women in their early 40s), Nelson Jantzen (a 55–year old white male), and Vicki Fuller (a black woman of unspecified age). *See id.* ¶¶ 18–21.

On December 12, 2000, Tappe brought this lawsuit alleging that Alliance discriminated against him because of his race and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, New York State Human Rights Law, N.Y. Exec. Law § 296(1), and New York City Human Rights Law, N.Y.C. Admin.Code § 8–107(a). *See* Complaint ¶¶ 27–32, 37–58.[2] Tappe also alleged that Alliance discriminated against him because of his age in violation of the New York City Human Rights Law. *See id.* ¶¶ 59–62.

According to the Complaint, "Alliance selected Tappe for termination over the

---

1. Tappe's allegations do not otherwise specify his annual salary since 1987 or state whether his annual bonus always comprised the majority of his compensation.

2. Tappe also brought a claim of race discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981, which was withdrawn with prejudice. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.Mem."), at 1 n. 1.

other portfolio managers in the High Yield Group because Tappe is a white male under 40 years of age and because each [sic] other portfolio manager is a member of a protected class by virtue of his or her gender, race and/or age." *Id.* ¶ 23. Other than Lyski's comment that "Tappe did not fit with the profile of the High Yield group," *id.* ¶ 14, Tappe has not alleged any other evidence to support his claims of race, sex and age discrimination.

In addition, Tappe sued Alliance for a breach of an implied contract and under the quasi-contract doctrine of quantum meruit because it did not pay him a bonus as it had in years past. *See id.* ¶¶ 63–75. Finally, because Alliance failed to provide him with "the payment of severance under the most favorable plan, practice or policy applicable to him," Complaint ¶ 81, Tappe sued it for breaching an implied contract and violating Article 6 of New York Labor Law, N.Y. Labor Law §§ 193, 198, or, in the alternative, for violating the Employment Retirement Income Securities Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. *See id.* ¶¶ 76–88; *see also* Pl. Mem. at 11–12.

## III. DISCUSSION

### A. Tappe's Claims of Race and Sex Discrimination

■ In language similar to the state and local laws under which Tappe has sued, Title VII makes it unlawful for an employer to "to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).[3] In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a burden-shifting framework for courts to apply when analyzing Title VII claims. Because courts analyze discrimination claims brought under Title VII, the New York Human Rights Law, and the New York City Human Rights Law in the same manner, this Court's consideration of the federal discrimination claims under the *McDonnell Douglas* paradigm applies with equal force to the state and local actions. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000).

■ According to *McDonnell Douglas* and its progeny, a plaintiff establishes a prima facie case of discrimination by showing:

(1) he is within a protected group,

(2) he is qualified for the position,

(3) he was subject to an adverse employment action,

(4) and the adverse action occurred under circumstances giving rise to an inference of discrimination based on membership in the protected group.

*See Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Id.* If the defendant meets this burden of production, "the presumption drops out of the

---

**3.** The New York State Human Rights Law states: "It shall be an unlawful discriminatory practice ... [f]or an employer or licensing agency, because of the age, race, creed, color, national origin, sex ... to discharge from employment such individual ...." N.Y. Exec. Law § 296(1). The New York City Human Rights Law makes it unlawful "[f]or an employer or an employee or agent thereof, because of the actual or perceived ... race [or] gender ... to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8–107(a).

analysis," *id.*, and the plaintiff must meet his ultimate burden of proving that he was the victim of intentional discrimination. *See id.; see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir.2001).

In this case, Alliance only challenges whether Tappe has satisfied the first and fourth prongs of the prima facie test.[4]

### 1. Tappe is in a Protected Group and Does Not Need to Allege "Background Circumstances" to Satisfy the First Prong

█ Alliance first argues that Tappe's race and sex discrimination claims must fail because he did not "allege that Alliance is the unusual employer who discriminates against the majority, also known as 'background circumstances.'" Def. Mem. at 7. The Second Circuit has not yet squarely decided whether a plaintiff in a "reverse discrimination" lawsuit must allege special circumstances to qualify as a member of a protected group, and circuit courts have split on the issue. *See, e.g., Iadimarco v. Runyon*, 190 F.3d 151, 160 (3d Cir.1999) (rejecting, for a number of reasons, the "background circumstances" test of *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981), and followed by the Seventh, Eighth, and Tenth Circuits, which requires reverse-discrimination plaintiffs to show that the employer generally discriminates against the majority).[5] Moreover, courts in this district have varied in deciding whether Title VII requires

reverse-discrimination plaintiffs to meet a higher pleading standard. *Compare, e.g., Cully v. Milliman & Robertson, Inc.*, 20 F.Supp.2d 636, 641 (S.D.N.Y.1998) *with Olenick v. New York Tel.*, 881 F.Supp. 113, 114 (S.D.N.Y.1995).

This Court must be guided by the Supreme Court, which on several occasions has indicated that Title VII does not distinguish between traditional and non-traditional plaintiffs. For example, in *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), three employees were "jointly and severally charged" with stealing. *See id.* at 276, 96 S.Ct. 2574. The company fired two of the employees, who were white, but retained the third employee, who was black. The two white employees then brought a lawsuit under Title VII alleging that they were fired because of their race. *See id.* at 276–78, 96 S.Ct. 2574. After both lower courts dismissed the complaint at the pleadings stage, the Supreme Court unanimously reversed. The Court emphasized that Title VII prohibits a "[d]iscriminatory preference for *any* [racial] group, *minority* or *majority.*" *Id.* at 279, 96 S.Ct. 2574 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)) (alteration in original). Moreover, the Supreme Court found the case "indistinguishable from *McDonnell Douglas,*" 427 U.S. at 282, 96 S.Ct. 2574, a case that involved black plaintiffs, and held that whatever criterion the company used

---

4. Alliance has not contested whether Tappe was qualified for his position. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment at 9 n. 5 ("Def.Mem."); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir.2001) (stating that "where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw"); *Gregory*, 243 F.3d at 696.

And, of course, termination qualifies as an adverse employment action.

5. *Iadimarco* rejected the "background circumstances" test because it (a) places a heavier burden on certain plaintiffs, (b) is vague and difficult to apply, (c) forces plaintiffs to present proof that ordinarily becomes relevant only at the pretext stage, and (d) may confuse the jury. *See Iadimarco*, 190 F.3d at 159–63.

to dismiss the employees "must be applied ... alike to members of all races." *Id.* at 283, 96 S.Ct. 2574 (quotation marks omitted).

In the Title VII context, the Supreme Court has also steadfastly held male plaintiffs to the same standard as female plaintiffs—no more or less. For example, in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Court considered whether a man could sue his employer under Title VII for harassment perpetrated by other male employees. In holding that Joseph Oncale had a cause of action, the Supreme Court stated "Title VII's prohibition of discrimination 'because of ... sex' protects men as well as women." *Id.* at 78, 118 S.Ct. 998. Moreover, when describing how Oncale might prove his claim of sex discrimination, the Court stated that Oncale only had to satisfy the same tests required of female plaintiffs; Oncale was not required to meet a heightened pleading standard. *See id.* at 81, 118 S.Ct. 998 ("Whatever evidentiary route the plaintiff chooses to follow, *he or she* must always prove that the conduct ... actually constituted 'discrimina[tion] ... because of ... sex.'") (emphasis added).[6]

The Second Circuit's decision in *McGuinness v. Lincoln Hall,* 263 F.3d 49 (2d Cir.2001) is also instructive, if not determinative. In *McGuinness,* the court held that the plaintiff, a white woman, established a prima facie case of race and sex discrimination when she alleged that a fellow employee, a black man (who was similarly situated to her in material respects) had received a better severance package. *See id.* at 52–53. "[T]his evidence alone satisfied plaintiff's 'minimal' burden to establish a prima facie case that she was treated differently on the basis of her race and gender." *Id.* at 53. The Second Circuit did not find it significant that the plaintiff was a white plaintiff bringing a race discrimination suit, and it did not require her to allege any special circumstances to establish a prima facie claim.

There is a final, and important, reason that this Court finds that Tappe has satisfied the first prong. No one doubts that the "background circumstances" test, if adopted, would place a higher burden on Tappe than a "traditional" plaintiff—after all, if Tappe was black, for example, he would not be required to allege any background circumstances. Such differential treatment, if adopted, would raise a serious question because treating plaintiffs differently because of their race or sex triggers heightened constitutional scrutiny.

█ This Court, like all courts, must provide "equal protection of the laws." *U.S. Const.* amend. XIV, § 1; *Bolling v. Sharpe,* 347 U.S. 497, 498–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954).[7] While not every

---

**6.** The Supreme Court has applied Title VII with an even hand regardless of the plaintiff's sex in other cases as well. *See, e.g., Newport News Shipbuilding and Dry Dock Co. v. EEOC,* 462 U.S. 669, 682–83, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (stating "[m]ale as well as female employees are protected against discrimination" and holding that an insurance plan discriminated against men because it treated male employees "in a manner which but for that person's sex would be different") (quotation marks and citation omitted).

**7.** When Congress passes a statute, an agency promulgates a regulation, or a government official makes a decision, government action is obvious and requires no discussion. Here, the governing statute is silent as to any distinction based on a complainant's race or gender. It is this Court's interpretation of the statute that might cause such a distinction to be made. Thus, the Court, in interpreting the statute, becomes the "government actor" for equal protection purposes and the Court's action must comport with the requirements of the Fourteenth Amendment. For example,

distinction based on race or sex is unconstitutional, such distinctions raise serious constitutional issues and must first survive a heightened equal protection scrutiny. *See, e.g., Nguyen v. INS,* 533 U.S. 53, ——, 121 S.Ct. 2053, 2059, 150 L.Ed.2d 115 (2001) (holding that statute with gender-based distinction survived equal protection scrutiny because it was substantially related to achieving important governmental objectives); *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (observing that strict scrutiny of racial classifications is not always "fatal in fact") (quotation marks omitted).

■ "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [courts] are obligated to construe the statute to avoid such problems." *I.N.S. v. St. Cyr,* 533 U.S. 289, ——, 121 S.Ct. 2271, 2279, 150 L.Ed.2d 347 (2001) (citations omitted).[8] The alternative interpretation of Title VII in this case—all plaintiffs have the same pleading burden regardless of their race or sex—is more than "fairly possible." It is the interpretation that flows from Title VII's plain language as well as the precedent of the Supreme Court and this Circuit. Tappe has therefore satisfied the first prong.

**2. Tappe Has Failed to Allege Facts to Support His Claims of Race and Sex Discrimination**

■ The defendant's second argument is that "Tappe's complaint fails to plead the fourth prong of the *McDonnell Douglas* test: that the termination decision was made under circumstances giving rise to an inference of discrimination." Def. Mem. at 9. "The level of specificity necessary to state a claim for Rule 12(b)(6) purposes is governed by the Federal Rules of Civil Procedure's notice pleading principles that call for no more than 'a short and plain statement' of a plaintiff's claim." *Gregory v. Daly,* 243 F.3d 687, 692 (2d Cir.2001). Thus, a plaintiff fails to state a claim if he merely alleges naked conclusions of law and does not plead any set of facts upon which a court could find a Title VII violation. *See id.* On the other hand, this Circuit has often emphasized that "the burden of establishing this prima facie case in employment discrimination cases is 'minimal.'" *McGuinness,* 263 F.3d at 53.

were the court to interpret the statute as requiring different pleading standards for white citizens than those applicable to black citizens, this different standard would be subject to equal protection review as the Court is a government actor. *See Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (holding that court may not award child custody based, in part, on the race of the parent and her partner); *cf. Shelley v. Kraemer,* 334 U.S. 1, 14, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (holding that court may not enforce a racially restrictive housing covenant); *New York Times v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (rejecting argument that a court's enforcement of a defamation claim was not state action because "[a]lthough this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press").

**8.** As the Supreme Court has explained: "This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. The Charming Betsy,* 2 Cranch 64, 118, 2 L.Ed. 208 (1804), and has for so long been applied by this Court that it is beyond debate." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (citations omitted). "This approach ... reflects the prudential concern that constitutional issues not be needlessly confronted...." *Id.*

The burden may be 'minimal, but it is still a burden. In this case, the only facts that Tappe alleges are that (1) he was fired and (2) he was told he "did not fit with the profile of the High Yield Group and its strategy going forward" and (3) "each [sic] other portfolio manager is a member of a protected class by virtue of his or her gender, race and/or age." Complaint ¶¶ 14, 23. These allegations, however, only show that Tappe worked in a diverse workforce and he was fired. To hold that these circumstances alone give rise to an inference of race or sex discrimination would mean that employees would *always* have a prima facie case of employment discrimination whenever they lost their jobs.

It is worth noting that in *McGuinness*, the Second Circuit stated: "A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination." 263 F.3d at 53 (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.2001)). Here, Tappe has alleged that those employees who were not terminated were "similarly situated" to him in all respects except for race or sex.

The Supreme Court has more than once warned lower courts not to apply the prima facie test blindly: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Indeed, the Second Circuit reiterated this same point in *McGuinness* when it stated, "because the facts inevitably vary in different employment discrimination cases, both the

Supreme Court and this Court have explained that the 'prima facie proof required' in a given case will depend on the specific facts in question." 263 F.3d at 53. It must be remembered that the underlying rationale of the prima facie case is that it "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are *more likely than not* based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089 (emphasis added) (quotation marks and citation omitted). Some situations warrant this presumption; others do not.

For example, if an employer fires two white employees because, according to her, "they were stealing" but she does not fire a black employee who was also stealing, it is appropriate to presume that race played a role in the decision. *See Santa Fe Trail Transp. Co.*, 427 U.S. 273, 276, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Obviously, an employer who was truly concerned about employees who steal would fire all such employees. Her failure to do so thus gives rise to an inference of discrimination unless the employer proffers some legitimate reason for the differential treatment. Likewise, experience shows that similarly situated employees usually (but probably not always) receive the same severance packages. Thus, providing substantially different severance packages to employees who are alike in all material aspects except for their race and sex can support an inference of discrimination. *See McGuinness*, 263 F.3d at 53.

■■ In contrast, it strains credulity to presume that an employer's decision to fire *any* employee, without any other facts, is "more likely than not" based on the employee's race or sex. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. Employers fire employees every day for reasons that have nothing to do with the employee's race and sex—whenever the market takes a down-

turn *someone* gets fired. Indeed, an employer can fire an employee on a whim because "under New York law as it now stands, absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired." *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); *see also Jones v. Dunkirk Radiator Corp.*, 21 F.3d 18, 21–22 (2d Cir.1994) ("Under New York's employment-at-will doctrine, an employer has a nearly unfettered right to discharge an employee.").[9]

■ Although a showing that an employer treated a similarly situated employee differently is frequently an effective method of establishing a prima facie case, it is not sufficient in all situations. To hold that Tappe has stated a claim by simply alleging that he was fired (and other employees were not) would render the first step of the test established by *McDonnell Douglas* nothing more than a formality and, in effect, shift the burden to the employer to give a non-discriminatory reason every time an employee's job was terminated. Rather than abrogate the right of an employer in New York to fire an employee at will, I conclude that Tappe has failed to allege that he was terminated "under circumstances giving rise to an inference of discrimination." *Farias*, 259 F.3d at 98.

### 3. Tappe is Granted Leave to Amend His Race and Sex Discrimination Claims

Tappe has requested "leave to amend his pleading to include any further allega-

tions deemed necessary." Pl. Mem. at 18. Pursuant to Rule 15(a), leave to amend a complaint "shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Tappe is thus granted leave to amend his race and discrimination claims within twenty days of the receipt of this Order.

### B. Tappe Has Not Stated a Claim of Age Discrimination

■■ Claims of age discrimination are analyzed under the *McDonnell Douglas* framework as well. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (applying *McDonnell Douglas* framework to federal age discrimination claim). Because Tappe has alleged no evidence other than that three of his co-workers were older than him and not fired, his claim of age discrimination fails to state a claim. For the reasons above, Tappe is also granted leave to amend his age discrimination claim within twenty days of the receipt of this Order.

### C. Tappe Has Stated a Claim of Quantum Meruit

■ Based on the allegation that Alliance fired him on December 8, 1999, "the date on which Alliance was to pay its employees their 1999 bonus compensation," Complaint ¶ 13, Tappe has brought a claim for quantum meruit. Under New

---

9. As the Second Circuit has pointed out, an employer can fire an employee for any reason as long as the reason is non-discriminatory even if based on reasons that are "unbecoming or small-minded, such as back-scratching,

log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1337 (2d Cir.1997).

York's well-established test, Tappe must prove: "the performance of services in good faith, acceptance of the services by the person to whom they are rendered, an expectation of compensation therefor, and the reasonable value of the services." *Freedman v. Pearlman*, 271 A.D.2d 301, 706 N.Y.S.2d 405, 408 (1st Dep't 2000); *see also Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386 (2d Cir.2001) (stating the elements of a quantum meruit claim under New York law).

According to the Complaint, Tappe generated substantial revenue for Alliance on the expectation of receiving a salary *as well as* a bonus that was significantly more valuable that his salary. *See id.* ¶ 73. Indeed, Tappe's annual bonus had comprised the majority of his yearly compensation in recent years. For example, while he was only paid a base salary of $125,000 the previous two years, he received a bonus of $650,000 in 1997 and $700,000 in 1998. *See id.* ¶ 12. Tappe also claims that within the securities industry, it is "common practice" for companies to pay their employees in this fashion. *See* Pl. Mem. at 10. These allegations, if proven, could support a finding of quantum meruit.[10]

Alliance, however, has moved to dismiss this claim on the ground that Tappe "has not alleged a necessary element of that claim: that he failed to receive compensation for duties that he performed which were distinct in character from those duties for which he was compensated." Def. Mem. at 11–12. In support of this position, Alliance cites *LaJaunie v. DaGrossa*, 159 A.D.2d 349, 552 N.Y.S.2d 628, 629 (1st Dep't 1990), which

held that a plaintiff had no quantum meruit claim because "there [was] no evidentiary basis for the *necessary* element of such claim, that the allegedly uncompensated duties (performed) were distinct in character from those duties for which plaintiff was compensated." *Id.* at 629 (emphasis added).

Alliance's reliance on *LaJaunie* is misplaced. In *LaJaunie*, the defendants paid LaJaunie $300 a week to help in "designing, renovating and managing a restaurant" beginning in July 1985. 552 N.Y.S.2d at 628. The renovations began three months later in September 1985 and the restaurant opened in March 1986. Three weeks after that, the defendants fired LaJaunie. *Id.* LaJaunie then brought two causes of action, the first of which has no bearing on the issues before this Court. LaJaunie's second claim was for quantum meruit based on his contention that his $300 weekly salary only compensated him for his physical labor but not his consulting. *See id.* On summary judgment, the court dismissed this action because LaJaunie failed to produce any evidence that the $300 weekly salary did not compensate him for both his labor and his consulting. *See id.*

*LaJaunie* differs from this case in two important ways. *First,* the *LaJaunie* court granted summary judgment because the plaintiff had proffered no evidence in the "complaint, bill of particulars, deposition and affidavit" to support his claim. *Id.; see also* Fed.R.Civ.P. 56(c) (summary judgment is appropriate "if the pleadings, depositions ... [and] affidavits, if any, show that there is no genuine issue as to any material fact"). In contrast, this

---

**10.** This is not to say that every time an employer fails to award a bonus, even where one has been given in the past, a quantum meruit claim arises. Quantum meruit is an equitable remedy that is awarded when "the circumstances [are] such that equity and good conscience require the defendant to make restitution." *Poppo v. Aon Risk Servs. Co. of New York*, No. 00 Civ. 4165, 2001 WL 392543, at *2 (S.D.N.Y. Apr.17, 2001).

Court is considering a motion to dismiss, a stage at which all inferences must be drawn in Tappe's favor. *See Tarshis*, 211 F.3d at 35 (dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

*Second*, the plaintiff in *LaJaunie* alleged that he performed two distinct jobs (*e.g.*, consultant and laborer) but was only compensated for one. In this case, Tappe alleges he performed only one job, portfolio manager, and complains that he only received partial compensation for this job. It makes sense to require a plaintiff to distinguish the jobs for which he already has received compensation from those he has not when it is alleged that he performed more than one duty. But this rationale does not apply when the plaintiff alleges that the partial compensation he received was for only one job. It would be impossible for Tappe to parse out the components of his job as portfolio manager and assign a percentage value to each separate task.

Given these important differences, it would be inappropriate to hold that *La-Jaunie* altered New York's basic and long-standing test for quantum meruit as it applies to this case.[11] Alliance's motion to dismiss Tappe's quantum meruit claim for failure to state a claim is therefore denied.

### D. ERISA Preempts Tappe's Claims Related to Alliance's Failure to Provide a Severance Package

 Tappe is also suing Alliance for violating ERISA or, in the alternative, breaching an implied contract under state common law and violating sections 193 and 198 of Article 6 of the New York Labor Law based on its failure to provide severance "under the most favorable plan, practice or policy" that Alliance provides to its employees. Alliance has moved to dismiss the state claims on the ground that they are preempted by ERISA.

ERISA provides that its regulatory provisions "shall supersede any and all State laws insofar as they ... *relate to* any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). The Supreme Court has "long acknowledged that ERISA's pre-emption provision is clearly expansive." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (quotation marks and citation omitted). Indeed, at various times, the Court has stated that the pre-emption provision has "broad scope," an "expansive sweep," and is "broadly worded," "conspicuous for its breadth," and "deliberately expansive." *Id.* (quotation marks and citations omitted).

 Applying ERISA to this case is straight-forward. Under ERISA, a severance payment qualifies as an employee benefit. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 565 (2d Cir. 1998); *see also* 29 C.F.R. § 2510.3–1(a)(3). ERISA thus preempts all state laws that "relate to" an employer's severance plans. In this case, Tappe has asserted that he "is entitled to the payment of severance *under the most favorable plan, practice or policy* applicable to him." Complaint ¶ 81 (emphasis added). Tappe has also based his state claims on the allegations that:

 (a) Alliance has a *long-standing policy and practice* of paying severance to terminated employees; (b) in the past, terminated employees received severance based upon this long-standing practice; (c) Tappe and Alliance mutually understood that severance was paid to terminated employees; and (d) Tappe was

---

11. Indeed, in the decade since *LaJaunie* was decided, no state court has even cited it.

aware of Alliance's *long-standing practice* of paying severance and relied upon it in rendering services to Alliance throughout the course of his employment. *Id.* ¶ 78 (alleging facts to support state claims) (emphasis added). Because Tappe has directly based his state claims on severance plans that Alliance allegedly provides to terminated employees on an ongoing basis, the claims are preempted by ERISA. *See Schonholz v. Long Island Jewish Med. Cent.*, 87 F.3d 72, 75 (2d Cir.1996).[12]

 Tappe attempts to avoid preemption by arguing that under Rule 8(e)(2), his "pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case." Pl. Mem. at 12 (quoting *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir.1985)). Although Tappe's statement of the law is certainly correct, *see Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) ("[u]nder Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency"), this argument misses the point. Whether ERISA preempts Tappe's state law claims does not depend on whether he brings an ERISA claim; it depends on whether his claims "relate to" an employer's severance plan.[13] Even if Tappe had not brought an ERISA claim, the analysis would still be the same. When analyzed "independently," *Molsbergen*, 757 F.2d at 1019, Tappe's state law claims remain related to the compensation that he claims Alliance should have paid under its long-standing severance policy. Given the breadth of ERISA's preemption clause, his state claims must be dismissed.

## IV. CONCLUSION

To summarize:

1. Defendant's motion to dismiss plaintiff's claims of race, sex and age discrimination is granted with leave to amend within twenty days of receiving this Order.

2. Defendant's motion to dismiss plaintiff's quantum meruit claim is denied.

3. Defendant's motion to dismiss plaintiff's state claims relating to Alliance's severance plan is granted.

A conference is scheduled for November 5, 2001 at 4:30 p.m.

SO ORDERED.

---

**12.** Nor does it matter that at times Tappe refers to the Alliance severance plan as a "practice" or "policy." The key is whether Alliance created an "ongoing" program to effectuate severance pay. *Fort Halifax*, 482 U.S. at 18, 107 S.Ct. 2211. A "long-standing" policy of paying severance qualifies as ongoing. Indeed, the severance payments that have not fallen under ERISA's scope have been one-time lump sums or payments that were offered only upon notice of termination. *See, e.g., id.* at 12, 107 S.Ct. 2211 (holding a one time severance payment to employees upon a plant closing was not preempted by ERISA because it did not create an "employee welfare benefit plan"); *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 464 (2d Cir.1993) (holding a promise to pay workers who continued employment until the closing did not constitute an employee welfare benefit plan because "the nature of the payments did not require an ongoing administrative employer program"); *Dennis v. RSL COM U.S.A., Inc.*, No. 97 Civ. 5013 (HB), 1998 WL 409720, at *4 (S.D.N.Y. July 21, 1998) (holding that offer of six weeks pay to executive upon being terminated is not covered by ERISA).

**13.** "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).