Wayne TAPPE, Plaintiff,

v.

**ALLIANCE CAPITAL MANAGEMENT L.P., Defendant.**

No. 01 Civ.2068(SAS).

United States District Court,
S.D. New York.

Dec. 19, 2001.

Jeffrey L. Liddle, Liddle & Robinson, L.L.P., New York City, for Plaintiff.

Frances Mary Maloney, Gerald Spada, Epstein Becker & Green, P.C., New York City, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

On October 25, 2001, this Court dismissed seven claims of race, sex and age discrimination brought against Alliance Capital Management L.P. by Wayne Tappe on the ground that Tappe had failed "to plead his discrimination claims with sufficient particularity to state a claim." *Tappe v. Alliance Capital Mgmt. L.P.*, 177 F.Supp.2d 176, 178–79 (S.D.N.Y.2001). Three weeks later, Tappe filed an amended complaint with the Court's permission. *See* 11/19/01 First Amended Complaint ("Am.Compl.").

The Amended Complaint has ten causes of action: Six claims allege that Alliance discriminated against Tappe because of his race and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, New York State Human Rights Law, N.Y. Exec. Law § 296(1), and New York City Human Rights Law, N.Y.C. Admin. Code § 8–107, subd. 1(a). *See* Am. Compl. ¶¶ 42–70. One claim alleges that Alliance discriminated against Tappe because of his age in violation of the New York City Human Rights Law. *See id.* ¶¶ 71–74. Two claims allege state law violations—one claim for breach of implied-in-fact contract and one claim for quantum meruit. *See id.* ¶¶ 75–87. Finally, one claim alleges that Alliance violated the Employment Retirement Income Securities Act of 1974, 29 U.S.C. §§ 1001–1461. *See id.* ¶¶ 88–91.

Alliance now moves to dismiss the discrimination claims under Federal Rule of Civil Procedure 12(b)(6). *See* Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def.Mem.") at 4–8. For the reasons below, Alliance's motion is denied.

### I. LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of plaintiff." *Weinstein v. Albright*, 261 F.3d 127, 131 (2d Cir.2001). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000) (quotation marks and citation omitted). Courts should "include in this analysis not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the pleadings or in documents incorporated by reference." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001). Finally, courts must remain "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Id.*

## II. FACTUAL BACKGROUND

Wayne Tappe's Amended Complaint contains the following relevant allegations, which must be read "in the light most favorable to plaintiff." *Gregory*, 243 F.3d at 691 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In 1987, Tappe began working for Alliance Capital Management L.P., an investment research and management organization. *See* Am. Compl. ¶ 10. Throughout his employment, Alliance paid Tappe a base salary and an annual cash bonus, which constituted a substantial portion of Tappe's annual compensation package. *See id.* ¶¶ 11, 77. For example, in 1997, Tappe earned a salary of $125,000 and a bonus of $650,000. *See id.* ¶ 11. Similarly, in 1998, Alliance paid Tappe a $125,000 salary and a $700,000 bonus. *See id.*

Alliance increased Tappe's salary to $150,000 in 1999, but he received no bonus that year. *See id.* ¶¶ 11, 79. Rather, on the day that other employees received their end-of-the-year bonuses, Tappe was fired. Tappe received his notice when the head of Alliance's Fixed Income Division, Wayne Lyski, "told Tappe that it was 'time for him to leave the firm' and that Alliance was terminating his employment." *Id.* ¶ 27. Besides not receiving a bonus for 1999, Tappe also lost several million dollars in unvested benefits including stock options. *See id.* ¶ 40.[1] Tappe also received no severance pay despite Alliance's long-standing policy to grant it. *See id.* ¶ 89–90.

At the time, Tappe was a 38–year old white male working in Alliance's High Yield Group with four other portfolio managers: Sheryl Rothman and Vita Pike (two white women in their early 40s), Nelson Jantzen (a 55–year old white male), and Vicki Fuller (a black woman of unspecified age). *See id.* ¶ 12–15. Tappe was the only person who lost his job even though his work performance was superior to everyone in the group. *See id.* ¶¶ 46, 61, 72; *see also* Plaintiff's Memorandum of Law in Opposition ("Pl.Mem.") at 5.

Indeed, not only had Tappe co-founded the High Yield Group (with Nelson Jantzen), but he managed the group's largest pool of assets. *See* Am. Compl. ¶¶ 22, 40. For example, Tappe's high-yield mutual funds totaled around $4 billion in assets, while Jantzen's funds only totaled $2.5 billion. *See id.* ¶ 18. Tappe also traveled more than the other managers—almost twice a month. *See id.* ¶ 24. The hard work apparently paid off because from 1995 until the day he was fired (December 8, 1999), Tappe raised $3–5 billion in assets for the High Yield Group, an amount that was significantly more than that raised by any other manager in his group. *See id.* ¶ 23.

The funds managed by Tappe also outperformed the other managers' funds. For example, Tappe managed the Alliance High Yield Fund that contained around $700 million in assets. *See id.* ¶ 20. A year after its creation in April 1997, the fund was rated number one by Lipper & Company ("Lipper"), an investment banking firm that ranks over 500 high-yield funds. *See id.* Likewise, the $600 million Hudson River High Yield Fund that Tappe managed had received a number-one Lipper rating in 1996 and 1997.[2] *See id.* ¶ 21.

Prior to being fired, Tappe had heard from several co-workers that Alliance was

---

1. The Amended Complaint does not state when the benefits would have vested.

2. The funds managed by Tappe also had a higher profile because he managed public funds as opposed to the private funds handled by the other portfolio managers. *See id.* ¶ 19. Moreover, these private funds were much smaller than the funds that Tappe managed, consisting of around $50–$150 million in assets. *See id.* ¶ 22.

planning on firing either him or Fuller, an African–American woman. *See id.* ¶ 26. When told that he was being terminated, Tappe asked Lyski for an explanation. "Lyski said that Tappe did not fit with the profile of the High Yield Group and its strategy going forward." *Id.* ¶ 28. Tappe responded that he was surprised that Alliance had fired him rather than Jantzen, Fuller or Pike. *See id.* ¶ 29. Jantzen had already informed Alliance that he wanted to leave the firm with an early retirement package, while Fuller and Pike had been given limited responsibilities in 1999. *See id.* ¶¶ 30–31. "Moreover, Fuller managed various collateralized bond obligations ('CBOs') that performed dismally in 1998 and 1999." *Id.* ¶ 31. Lyski's only response was "no comment."

Shortly after Tappe was fired, Alliance transferred Fuller from portfolio manager to a marketing position in the High Yield Group, a position that she currently holds. *See id.* ¶ 31. In December 2000, Alliance also allowed Jantzen to retire and vest his benefits rather than terminate his employment. *See id.* ¶ 41. In the summer of 2001, Alliance fired Pike but allowed her to vest some of her stock options upon termination. *See id.* ¶ 42. Based on these allegations, Tappe believes that:

> Alliance selected Tappe for termination over the other portfolio managers in the High Yield Group because it feared that it would subject itself to a claim of discrimination if it terminated any of the other portfolio managers, given that Tappe is a white male under 40 years of age. . . .

Am. Comp. ¶ 34.

## III. THE DIFFERENCE BETWEEN SINGLE–MOTIVE AND MIXED–MOTIVE THEORIES OF DISCRIMINATION

■ In language similar to the state and local laws under which Tappe has sued,

Title VII makes it unlawful for an employer "to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Because courts in this Circuit analyze discrimination claims brought under Title VII, the New York Human Rights Law, and the New York City Human Rights Law in the same manner, this Court's consideration of Tappe's federal discrimination claims applies with equal force to his state and local actions. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000).

The Supreme Court has established two methods by which plaintiffs may prove their claims of intentional discrimination. First, plaintiffs may present a single-motive (or pretext) case by using the three-stage burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In these cases, a plaintiff makes a prima facie case of discrimination by showing:

(1) he is within a protected group,

(2) he is qualified for the position,

(3) he was subject to an adverse employment action,

(4) and the adverse action occurred under circumstances giving rise to an inference of discrimination based on membership in the protected group

*See Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Id.* If the defendant meets this burden of production, "the presumption drops out of the

analysis," *id.*, and the plaintiff must meet his ultimate burden of proving that he was the victim of intentional discrimination. *See id.; see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir.2001).

◼ Plaintiffs may also proceed under a mixed-motive theory, which the Supreme Court established in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241–42, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under this approach, the plaintiff must first produce direct (as opposed to indirect or circumstantial) evidence that the employer's action was motivated by a protected characteristic such as the plaintiff's race or sex. Because such evidence proves that a prohibited factor "played a motivating part" in the employer's decision, the burden of persuasion then shifts to the employer. *Id.* at 258, 109 S.Ct. 1775. The employer is therefore liable unless it can prove by a preponderance of the evidence that it would have made the same decision even if the prohibited characteristic had not played a role in its decision. *Id.* at 242, 244, 109 S.Ct. 1775.

◼ The differences between the two approaches are as obvious as they are critical. In a pretext case, plaintiffs do not need to prove much to establish a prime facie case; plaintiffs must only show that the "adverse action occurred under circumstances giving rise to an *inference* of discrimination." *Farias*, 259 F.3d at 98 (emphasis added). The Second Circuit has frequently emphasized that "the burden of establishing this prima facie case in employment discrimination cases is 'minimal.'" *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000).

◼ Plaintiffs face a more difficult first step under a mixed-motive theory because they must present *"direct* evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring) (emphasis added). By definition, requiring plaintiffs to produce direct evidence places a heavier burden on them than the burden that must be initially satisfied under *McDonnell Douglas*. "The types of indirect evidence that suffice in a pretext case to make out a prima facie case—or even to carry the ultimate burden of persuasion— do 'not suffice, even if credited, to warrant' a *Price Waterhouse* burden shift." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997) (quoting *Ostrowski v. Atlantic Mut. Ins. Companies*, 968 F.2d 171, 182 (2d Cir.1992)).[3]

◼ "Because discrimination tends more and more to operate in subtle ways, direct evidence is relatively rare." *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 580 (1st Cir.1999). Moreover, "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason' expressly forbidden by law." *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir.1999) (alternation in original) (quotation marks and citation omitted). Thus, courts have long-recognized that "in most employment discrimination cases direct evidence of the employer's motivation is unavailable or difficult to acquire." *Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir.1984).

Producing direct evidence of discrimination does have its reward, however. As explained above, once the plaintiff proffers

---

**3.** The Ninth Circuit has recently pointed out that every circuit recognizes this distinction as well as the different burdens of proof that each test involves. *See Costa v. Desert Palace, Inc.*, 268 F.3d 882, 886–88 (9th Cir.2001).

such evidence, the burden of persuasion not only shifts to the defendant but it remains there. In contrast, the prima facie case under *McDonnell Douglas* is easy to satisfy but also easy to defeat. In fact, the prima facie case only shifts the burden of *production* to the defendant. Thus, an employer must only articulate a legitimate, nondiscriminatory reason to shift the ultimate burden back to the plaintiff. Indeed, because the defendant only bears a burden of production, the defendant does not need to persuade the court that it was, in fact, motivated by the proffered reason. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Given the important differences between these two methods of proof, it is easy to see why more than one circuit court has recently emphasized the different evidentiary burdens that plaintiffs carry under each theory. *See, e.g., Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir.2001) ("The district court was correct in applying the *McDonnell Douglas* analysis, as [the plaintiff] presented no direct evidence of discrimination. Direct evidence is that which demonstrates a specific link between the challenged employment action and the alleged animus.") (quotation marks and citation omitted); *Costa*, 268 F.3d at 888 n.3 ("The reason for the distinction [between direct and indirect evidence] is that in a mixed-motive case the burden of proof shifts to the defendant once the plaintiff has produced sufficient evidence, while in a pretext case the burden always remains with the plaintiff."); *Kirk v. Hitchcock Clinic*, 261 F.3d 75, 78–79 (1st Cir.2001) ("First Circuit precedent dictates that the mixed-motive test is reserved solely for cases in which direct evidence of unlawful

activity has been submitted."); *Watson v. Southeastern Pennsylvania Transp. Auth.*, 207 F.3d 207, 215 (3d Cir.2000) ( "[T]he *Price Waterhouse* shift in the burden of persuasion does not apply to 'pretext' cases, in which plaintiffs prove intentional discrimination *indirectly* through the burden-shifting paradigm set forth in *McDonnell Douglas* and its progeny.") (emphasis added).

■ On the one hand, lower courts must be careful not to allow plaintiffs to proceed under the mixed-motive theory when they have only presented indirect or circumstantial evidence of discrimination, thereby lowering the evidentiary bar that justifies shifting the burden of proof to the employer under *Price Waterhouse*. *See, e.g., Costa*, 268 F.3d at 889. On the other hand, lower courts must be equally vigilant not to *raise* the burden of proof necessary to proceed under *McDonnell Douglas* by holding that plaintiffs must present direct evidence in pretext cases. Indeed, courts commit error by "equating a prima facie showing under *McDonnell Douglas* with an ultimate finding of fact as to [discrimination]." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Because the burden-shifting framework is not meant to be "rigid" but rather "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," *id.* at 577, 98 S.Ct. 2943, the plaintiff's initial burden is only "minimal."

## IV. DISCUSSION

■ Alliance argues that Tappe's Amended Complaint is "fatally flawed" because the "Amended Complaint still offers no *direct* evidence of discrimination." Def. Mem. at 2 (emphasis added).[4] But this

---

**4.** *See also id.* at 4 ("Tappe offers no actionable     direct evidence of discrimination in the

argument misses the mark; the *McDonnell Douglas* framework does not require a plaintiff to allege direct evidence of discrimination. *See supra* Part III. Indeed, "*McDonnell Douglas* itself dealt with a situation where the plaintiff presented *no direct evidence* that the employer had relied on a forbidden factor under Title VII in making an employment decision." *Price Waterhouse*, 490 U.S. at 270, 109 S.Ct. 1775 (O'Connor, J., concurring) (emphasis added).

■ Alliance further argues that "[a]s Tappe has not alleged any direct evidence of discrimination, Tappe had to show he was treated less favorably than 'similarly situated' employees under circumstances giving rise to an inference of discrimination." Def. Mem. at 5. This argument errs by adding a "similarly situated" element to the often-repeated fourth prong of the *McDonnell Douglas* test. A pretext case only requires that the "adverse employment action occurred *under circumstances giving rise to an inference of discrimination* on the basis of plaintiff's membership in that class." *Farias*, 259 F.3d at 98 (emphasis added); *Holtz*, 258 F.3d at 82; *Roge*, 257 F.3d at 168; *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.2001).

Of course, the similarly situated test may play a role in this analysis. *See McGuinness*, 263 F.3d at 53; *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60 (2d Cir.1997); *Tappe*, 177 F.Supp.2d 176, 184. For example, an inference of discrimination is raised when an employer fires two white employees, but not a black employee, for stealing. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273,

276, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Likewise, "experience shows that similarly situated employees usually (but probably not always) receive the same severance packages." *Tappe*, 177 F.Supp.2d at 184. "Thus, providing substantially different severance packages to employees who are alike in all material aspects except for their race and sex [or age] can support an inference of discrimination." *Id.* (quoting *McGuinness*, 263 F.3d at 53).

But the similarly situated test is not a talisman—a plaintiff's claim of discrimination does not succeed or fail depending on his ability to find co-workers that are similar to him except for some protected characteristic. In *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), for example, Joseph Oncale worked on an all-male oil rig and sued his employer for sex discrimination under Title VII. *See id.* at 76, 118 S.Ct. 998. It would have been impossible for Oncale to find co-workers that were similarly situated except for their sex. Nonetheless, the Supreme Court held that Oncale still had a cause of action as long as he proved that he suffered " 'discriminat [ion] . . . because of . . . sex' in the 'terms' or 'conditions' of employment." *Id.* at 79–80, 118 S.Ct. 998 (quoting 42 U.S.C. § 2000e–2(a)(1)).

■ In other words, "[a] showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination, but it is only *one way* to discharge that burden." *McGuinness*, 263 F.3d at 53 (2d Cir.2001) (quotation marks and citation omitted) (emphasis added); *see also Holtz*, 258 F.3d

---

Amended Complaint."); Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss at 2 (arguing that Tappe's Amended Complaint should be dismissed because "his opposition papers present no direct evidence of discrimination" and "Tappe concedes, as he must, that there is no direct evidence of discrimination in the Amended Complaint").

at 77 (reversing court's decision to dismiss the case on the ground that the plaintiff "failed to show that she was treated differently than were other similarly situated employees" because "such evidence is not always necessary"); *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001) (rejecting "the notion that the *only* way a plaintiff can make out an inference of discrimination is to demonstrate that he was treated differently from other similarly situated employees") (emphasis in original).

As I previously held, applying the similarly situated test to this case is not helpful. *See Tappe,* 177 F.Supp.2d at 183. Tappe can easily point out that Sheryl Rothman, Vita Pike, Nelson Jantzen, and Vicki Fuller were not fired even though all were "similarly situated" to him except for their race, sex or age. *See id.* But this describes the situation of every person who works in a diverse workplace, and it makes no sense to hold that every person has a prima facie case of discrimination simply because they are fired. *See id.*

At the same time, Alliance did not give Tappe a reason for his termination, so he cannot point to an individual that was similarly situated with respect to the employer's purported reason for firing him. *Compare Santa Fe Trail Transp. Co.,* 427 U.S. at 276, 96 S.Ct. 2574 *with Tappe,* at 184. Nor can Tappe point to another person who was fired that day and treated differently in the process (because no one else was fired). *Compare McGuinness,* 263 F.3d at 53 *with Tappe,* at 184.

But this does not end the inquiry of whether Tappe has satisfied his minimal burden under *McDonnell Douglas.* Tappe has alleged that Alliance fired him even though he performed his job *better* than anyone in his group. This allegation raises an inference of discrimination because, while employers who impermissibly rely on a protected characteristic may fire their best employee (and him alone), employers motivated by profit or other legitimate reasons do not. Indeed, the quintessential discrimination case involves an employer firing an employee not based on the employee's merits (e.g., the employee has failed to perform his duties) but because of his race, sex, age or another protected characteristic.

Moreover, Tappe has alleged that Alliance fired him "because it feared that it would subject itself to a claim of discrimination if it terminated any of the other portfolio managers, given that Tappe is a white male under 40 years of age." Am. Compl. ¶ 34. If proven, these facts would qualify as unlawful discrimination. It may be true that the typical Title VII case or claim involves impermissible animus or stereotyping of an employee, but the statute is not limited to such situations. Rather, Title VII extends to any case in which an employer treats an employee differently "because of" the person's race, sex or other protected characteristic. 42 U.S.C. § 2000e.

## V. CONCLUSION

Because Tappe has alleged facts which would support a prima facie case of discrimination under *McDonnell Douglas,* the motion to dismiss is denied. A conference is scheduled for December 27, 2001 at 4:30 p.m.